John S. DESIMONE, Plaintiff,

v.

Timothy A. BARROWS, Paul W. Chisholm, Gururaj Deshpande, Paul J. Ferri, John W. Gerdelman, Frances M. Jewels, Daniel E. Smith, Anita Brearton, Kurt Trampedach, Jeffry A. Kiel, Kevin J. Oye, Defendants,

and

Sycamore Networks, Inc., Nominal Defendant.

C.A. No. 2210–VCS.

Court of Chancery of Delaware, New Castle County.

Submitted: March 9, 2007.
Decided: June 7, 2007.

Pamela S. Tikellis, Esquire, Robert J. Kriner, Jr., Esquire, A. Zachary Naylor, Esquire, Scott M. Tucker, Esquire, Chimicles & Tikellis, LLP., Wilmington, Delaware, Attorneys for Plaintiff.

Anthony W. Clark, Esquire, Robert A. Weber, Esquire, Skadden, Arps, Slate, Meagher & Flom, LLP, Wilmington, Delaware, Attorneys for Nominal Defendant Sycamore Networks, Inc. and Defendants Gururaj Deshpande, Daniel E. Smith, Anita Brearton, Kurt Trampedach, Jeffry A. Kiel, and Kevin J. Oye.

James R. Carroll, Esquire, Michael S. Hines, Esquire, Skadden, Arps, Slate, Meagher & Flom, LLP, Boston, Massachusetts, Of Counsel for Nominal Defendant Sycamore Networks, Inc. and Defendants Gururaj Deshpande, Daniel E. Smith, Anita Brearton, Kurt Trampedach, Jeffry A. Kiel, and Kevin J. Oye.

John D. Donovan, Jr., Esquire, Kelly Begg Lawrence, Esquire, Ropes & Gray, LLP, Boston, Massachusetts, Attorneys for Defendants Timothy A. Barrows, Paul W. Chisholm, Paul J. Ferri and John W. Gerdelman.

William O. LaMotte, III, Esquire, Morris, Nichols, Arsht & Tunnell, LLP, Wilmington, Delaware, Attorney for Defendant Frances M. Jewels.

Michael S. Gardener, Esquire, Michael F. Connolly, Esquire, Mintz, Levin, Cohn, Ferris, Glovsky and Popeo, P.C., Boston, Massachusetts, Of Counsel for Defendant Frances M. Jewels.

## OPINION

STRINE, Vice Chancellor.

### I. *Introduction*

The nominal defendant in this derivative action, Sycamore Networks, Inc., is one of the many corporations drawing adverse attention regarding the methods by which it granted stock options to its officers, employees, and directors. Last year, the Securities and Exchange Commission and United States Department of Justice launched investigations into Sycamore's stock options practices on the suspicion that Sycamore had misrepresented—by backdating—certain options grants and engaged in related misbehavior.

Armed with the fact of the government investigations into Sycamore, with generic facts about options backdating gleaned from newspaper articles, and with allegations contained in (and a so-called "smoking gun" internal memorandum (the "Internal Memo") attached to) a complaint filed by a disgruntled former Sycamore executive in another court, the plaintiff, John S. Desimone, filed a complaint in this court on June 9, 2006 without making a demand on Sycamore's board and without having sought to obtain books and records

under 8 *Del. C.* § 220. The centerpiece of Desimone's complaint is the Internal Memo, written by an unknown author, which suggests that options granted to six rank-and-file employees in late 2000 were altered to have the option grant date coincide with the date of the lowest trading price of Sycamore's stock during the preceding quarter. When that Memo was revealed to Sycamore's board of directors in early 2005, Sycamore's Audit Committee launched an internal investigation. After that investigation, Sycamore disclosed that it had improperly accounted for certain stock option grants and restated its earnings for the fiscal years 2000–2003.

Desimone seeks to bring claims on behalf of Sycamore against the recipients of the allegedly improper grants and against Sycamore's board for breaching their fiduciary duties by allowing the grants to occur. The defendants have moved to dismiss the complaint for lack of standing, for failure to adequately plead demand excusal under Court of Chancery Rule 23.1 and for failure to state a claim under Rule 12(b)(6). In this opinion, I conclude that the motion must be granted.

For starters, plaintiff Desimone has only held stock in Sycamore since February 2002 and lacks standing under 8 *Del. C.* § 327 to pursue the lion's share of the claims he asserts, most of which are based on options grants that occurred in 2000 and 2001. Desimone contends that he has standing to challenge all of the grants because some of the later grants he challenges follow a similar pattern of behavior as those that occurred before he owned stock. Thus, Desimone alleges that he is attacking a pattern of "continuing wrongs." That argument, though, is belied by the fact that the complaint actually challenges a number of discrete stock op-

tion grants—transactions that were completed the moment the grants were issued. Those transactions did not continue into the time period of Desimone's stock ownership, and mere allegations that later grants of the same nature were made do not suffice to invoke the narrow continuing wrong exception to the clear statutory mandate that a derivative plaintiff must have owned stock at the time the transaction he attacks occurred in order to have standing to challenge that transaction on the corporation's behalf. Therefore, consistent with long-standing precedent such as *Elster v. American Airlines,*[1] and this court's recent decision in *Ryan v. Gifford,*[2] addressing an identical situation in the same manner, I hold that Desimone is barred by § 327 from attacking the options grants made before he became a Sycamore stockholder.

I also find that the defendants' Rule 23.1 and 12(b)(6) arguments dispose of Desimone's challenges to all of the stock option grants. Desimone challenges a number of different types of options grants and in determining the viability of Desimone's claims, it is useful to categorize his claims by the type of grant at issue. The first two categories involve grants of options to Sycamore's rank-and-file employees and to its officers (the "Employee Grants" and "Officer Grants," respectively). The last category involves grants of options to Sycamore's outside directors (the "Outside Director Grants"). The analysis appropriate to address the first two categories is, I find, different from that appropriate to address the third.

As Desimone concedes, the question of whether he has satisfied his burden under Rule 23.1 must be answered by applying the test set forth in *Rales v. Blasband*[3]

1.   100 A.2d 219 (Del.Ch.1953).

2.   918 A.2d 341 (Del.Ch.2007).

3.   634 A.2d 927 (Del.1993).

because Desimone does not challenge a business decision made by the Sycamore board. As a result, the relevant inquiry is whether the Sycamore board, as constituted at the time Desimone brought suit, could exercise an independent and disinterested business judgment in responding to a demand regarding Desimone's claims.[4] Because neither of the two members of the Sycamore board who were both officers and employees received any of the Employee or Officer Grants that Desimone challenges, the key issue under *Rales* as to the Employee and Officer Grants is whether, assuming the pled facts to be true, a majority of the Sycamore board faces a substantial likelihood of personal liability as a result of those Grants, thus compromising their ability to consider a demand impartially.[5]

As to the Employee Grants, Sycamore has essentially admitted in public filings that many of those Grants were backdated and that their true nature was concealed from the investing public and relevant regulatory authorities such as the SEC and IRS. Moreover, given the method used to account for the Employee Grants, it seems plain that the options were represented to the public as having been issued at fair market value, when in fact they were issued at a price lower than the fair market value that prevailed as of the dates of the Grants. In other words, the backdating was hidden.

But the key issue for purposes of this motion is whether the Sycamore board should be divested of its authority to address that misconduct. As to that issue, Desimone has fallen well short of his pleading burden. His complaint is devoid of any factual allegations on the key issues

of who approved the Employee Grants and whether any of the directors knew that options were being backdated. Sycamore's stockholder-approved option plans contemplated delegation of the option-granting function to non-director executive officers, and the complaint itself alleges that much of Sycamore's backdating operation was carried out by a single executive officer and was actively concealed from the board and from Sycamore's auditors. No facts in the complaint support an inference that members of the Sycamore board were aware that employees were being awarded backdated options.

Because the complaint is devoid of any facts suggesting a rational inference that any members of the Sycamore board, much less a majority, knew about the backdating of Employee Grants, Desimone has failed to create a reasonable doubt about the Sycamore board's ability to impartially consider a demand as to this category of claim. There is simply no basis to conclude that the Sycamore board faces a substantial threat of liability as a result of the Employee Grant claims, particularly in view of the corporation's exculpatory charter provision.

The next category—the Officer Grants—also involves the issue of undisclosed backdating, as well as the more subtle issues raised by so-called "spring loading" and "bullet dodging," which were carefully analyzed in this court's recent decision in *In re Tyson Foods, Inc. S'holder Litig.*[6] The Officer Grants involve two large issuances of options to several high-ranking executive officers in April 2001 and April 2002. By virtue of the size of these Grants and the identities of the re-

---

4. *Id.* at 934; *Guttman v. Huang,* 823 A.2d 492, 501–03 (Del.Ch.2003).

5. *Rales,* 634 A.2d at 934; *Guttman,* 823 A.2d at 500; *In re Baxter International, Inc. S'hold-*

ers *Litig.,* 654 A.2d 1268, 1270–71 (Del.Ch. 1995).

6. 919 A.2d 563 (Del.Ch.2007).

cipients, the decision as to the amounts of these Grants and who was to receive them was much less likely to have been delegated by Sycamore's board or its Compensation Committee to other executive officers.

But that reality does not mean the board or even the Compensation Committee was likely to have driven details like the precise date of issuance of the Grants. As to that point, Desimone alleges that both sets of the Officer Grants involved undisclosed backdating—that is, that Grants were actually made on dates after the corporation accounted for them as having been made and at a time when the corporation's stock price exceeded the price on the date falsely indicated as the date of issuance. If Desimone pled facts creating a rational inference that the directors knowingly approved backdated grants of options, realizing that the corporation would deceptively account for them to investors and regulatory authorities as having been made at fair market value on the date of issuance, demand would be excused, consistent with the *Ryan* decision.[7] But Desimone admits that he cannot even allege in good faith that the two members of the Sycamore board who served on the Compensation Committee knowingly approved improperly-backdated options,[8] much less that the other four directors did so. As a result, Desimone has failed to demonstrate that a majority of the Sycamore board faces a sufficient threat of liability over the alleged backdating of the Officer Grants to excuse demand.

The plaintiff also alleges that the April 2001 (but not the April 2002) Officer Grants are tainted by more than backdating. The allegation is that the recipient officers were granted a discretionary award of options on April 9, 2001 shortly after the company announced it had missed its quarterly earnings estimate (an announcement that allegedly lowered the company's stock price) and sixteen days before the company announced a positive development (an announcement that allegedly increased the company's stock price). Desimone therefore contends that the Officer Grants on April 9, 2001 constituted a breach of the duty of loyalty under *Tyson* because the Grants, while purporting to be issued at fair market value, were issued at a time when the corporation allegedly knew non-public information that would, when made public, assuredly raise the corporation's stock price and put the freshly-issued options immediately in the money. By this means, rather than providing officers with an incentive to work hard and improve the corporation's future performance, the Officer Grants actually reflected hidden bonuses to the recipients, which gave them additional compensation for positive developments that the corporation had already accomplished, but were not yet public.

But even here, the complaint's failure to plead particularized facts about these Grants is fatal to Desimone's desire to proceed. In so holding, I concede once again that it is inferable from the complaint that the fact that the Officer Grants were made was likely known by four members of the board, the two members of the Compensation Committee and the two directors who serve as Sycamore's Chief Executive Officer and Chairman respectively. The size of the Grants is such that these directors were likely to have approved the amounts and the officers to whom they were allocated.

---

7. *See Ryan,* 918 A.2d at 355 (holding that demand is excused when a complaint alleges that a majority of the board knowingly approved backdated options).

8. Transcript of Oral Argument (March 9, 2007) at 82.

What the complaint fails at all to do, however, is plead facts suggesting an inference that the directors who knew of the Officer Grants intended them to be a form of hidden bonus to be concealed from regulatory authorities and from Sycamore's stockholders. As to the fact that the Officer Grants were made after the issuance of bad news about the preceding quarter's results, nothing was hidden at all. I harbor serious doubt whether any claim, other than a claim for waste, can be lodged against an issuance of options, in conformity with the terms of a stockholder-approved option plan, at a fair market value reflecting negative information previously disclosed to the public markets. In that circumstance, the only viable question would seem to be whether the grant of options was somehow inequitable, in the sense that it involved the wasteful enrichment of a recipient at the corporation's expense (when the board or committee awarding the options was independent of the recipient) or unfair self-dealing (when the awarding board or committee was controlled by those receiving the options). Although stockholders might quibble with the decision whether to give large slugs of options to officers after a disappointing quarter, no deception on the stockholders, the market, or regulatory authorities is involved and the officers have the intended incentive to perform well in order to help the corporation's stock price improve from its level on the date of issuance, a level that reflects the negative information released.

The more troubling allegation, under this court's recent decision in *Tyson*, is of course that the Officers received options before a positive announcement some sixteen days later. Per *Tyson*, Desimone tries to contend that the Officers therefore received a concealed guaranteed bonus (because the granting authorities knew the market value of the corporation's shares did not reflect the positive, non-public information the corporation would soon release) rather than an award of options the value of which was dependent on the corporation's stock price increasing from a market price reflecting all material information.

By sharp contrast with *Tyson*, however, Desimone does not plead facts that suggest that members of the Sycamore board approved the April 9, 2001 Officer Grants with knowledge of corporate information that, if made public on the date of the Grants, would have increased the fair market value of the corporation's stock, turning the Grants into a bonus for past performance, rather than simply an incentive for future performance. Whereas in *Tyson* the plaintiffs pled a multi-year pattern of large grants occurring at random times of year that preceded large, market-moving announcements, here all Desimone pleads is that the corporation made the April 9, 2001 Officer Grants sixteen days in advance of a non-seismic positive announcement that hardly seemed likely to send Sycamore's stock price soaring to historic heights. Nor does the complaint allege facts supporting a rational inference that the announcement of the information in fact had that effect. As important, Desimone's insinuation that the April 9, 2001 Grants were intended as a hidden bonus is undercut by the reality that the Grants were subject to a three-year vesting schedule with sharp restrictions on pledging the options received. Put simply, it is not rational to infer from the pled facts that the board harbored any illicit intent to enrich the recipients at the expense of the Sycamore stockholders or to subvert the purposes of Sycamore's stockholder-approved options plan through clever timing of these Grants. In reaching that conclusion, the fact that the two officers who sit on the board—Sycamore's CEO and its Chairman—own a combined 32% of the company and did not receive any of the

disputed options tends to powerfully undercut any inference that the board itself had a motive to make its executive officers fat at the expense of the stockholders.

The final category of option grants under attack are the Outside Director Grants. Each of the four non-employee Sycamore directors received his pro-rata share of these options. That fact changes the prism through which I address this aspect of the dismissal motion. Because the Outside Directors, who comprise a majority of the board, received the Outside Director Grants from Sycamore, they would traditionally be considered interested in the Grants at issue and would be rendered incapable of impartially considering a demand under *Rales*. Furthermore, although the two inside directors own nearly a third of the company between them, they do not have majority voting control. Therefore, it would be difficult to find them independent of the board majority that maintains them in their corporate offices, even while acknowledging that the two insiders take, between them, almost no compensation for performing their executive duties.

Because a majority of the board is interested in the Outside Director Grants, the viability of this aspect of the motion to dismiss turns on whether the complaint states a claim under the more plaintiff-friendly Rule 12(b)(6) standard. Regrettably for Desimone, he cannot satisfy that standard either. The challenged Outside Director Grants were made under a stockholder-approved plan that provides that each Outside Director will receive 30,000 options each year on the date of Sycamore's annual meeting. Desimone does not challenge all of the Outside Director Grants made during the period his complaint encompasses. Instead, he picks out two years during which the company's annual meeting followed a month or so on the heels of a quarterly earnings report in which Sycamore announced poor results, claiming that the Outside Directors thus benefited in those years by having a low strike price for their options.

These allegations do not state a claim. The Sycamore stockholders approved the issuance of the exact number of options to be awarded annually to the Outside Directors and the date of issuance. All that is alleged by Desimone is that in two of the years, the plan-specified date of issuance was preceded by the regular disclosure of an earnings release containing negative information. The only difference between that and every other year is the negative nature of the information; in other years, the annual meeting was also preceded by the company's disclosure of its results for the preceding quarter. In sum, the complaint does not plead any deviation from the precise terms of the non-discretionary plan or from Sycamore's regular disclosure schedule. To hold that Desimone states a claim in these circumstances would prevent corporations from fairly implementing a non-suspicious program for awarding options, by penalizing participants by denying them (because the law would label it suspect to do otherwise) a regularly-scheduled award of options whenever the market price on the date that the plan dictates that the annual award be made is affected in a negative way by the news in a prior, regularly-scheduled quarterly report. The very point of a plan like Sycamore's that sets in advance, with stockholder approval, the amount and dates on which grants of options to directors will be made is to ensure integrity by making the directors suffer the ugly and enjoy the good that comes with a consistent, non-discretionary approach.

The weakness of Desimone's allegations in comparison to those in the *Tyson* case may not be entirely coincidental. Just as his allegations are strikingly less substan-

tial, so was the amount of effort put into his pleading. In *Tyson*, the plaintiffs tenaciously sought books and records from a reluctant corporation for a year before filing their derivative complaint, and they used those books and records to file the sort of particularized pleading expected from derivative plaintiffs. Desimone rushed into court, making generalized charges of wrongdoing unaccompanied by fact pleading about the involvement of the directors in the improprieties he contends occurred. Perhaps as a result, his complaint must be dismissed.

## II. *General Background*

As has been discussed, plaintiff Desimone challenges three different categories of options grants: Employee Grants, Officer Grants, and Outside Director Grants. This section of the opinion will outline the general background relevant to analyzing all of the categories in contest. Then, the opinion will address the merits of the defendants' dismissal arguments, setting forth the more specific facts as to each category in the course of analyzing the viability of Desimone's claims.

Before doing so, it is helpful to define some of the new jargon that has entered the corporation law lexicon as a result of the ongoing stock option controversy. Stock options "backdating" is a practice whereby a public company issues options on a particular date while falsely recording that the options were issued on an earlier date when the company's stock was trading at a lower price. The options are purportedly issued with an exercise price equal to the market price on the date of the option grant. But, in fact, because the grant dates were falsified, the options

were "in the money" when granted.[9] The practice of "spring loading" stock options involves making market-value options grants at a time when the company possesses, but has not yet released, favorable, material non-public information that will likely increase the stock price when disclosed. Conversely, "bullet-dodging" options are granted just after the company releases negative information to the market thereby allowing the recipient the benefit of a lower exercise price that reflects the price decline caused by the negative information.[10]

### A. *Sycamore's Business And Board*

Sycamore develops and markets optical networking products. It was founded in 1998 and went public at the height of the tech boom in 1999. Since going public, Sycamore's share price has fluctuated widely. The initial public offering was at $38 per share. From there, the stock went up to a high of more than $165 apiece in August 2000. By 2001, its shares were trading below $10 and currently trade between $3 and $4.

Two of Sycamore's founders serve on its six-member board. They are defendants Gururaj Deshpande, who serves as Chairman of the Board, and Daniel Smith, who serves as Chief Executive Officer and President. Deshpande owns 16.5% of the corporation's shares.[11] He does not receive any compensation, other than reimbursement of expenses, to be Chairman of the Board. Smith owns 15.5% of the corporation's shares.[12] He receives an annual $100,000 salary to be CEO and President and has not received any bonus or stock option grant in any year since Sycamore went public.

---

**9.** *See Ryan*, 918 A.2d at 341 (describing the mechanics of stock options backdating).

**10.** *See generally Tyson*, 919 A.2d 563 (Del.Ch. 2007) (discussing spring loading and bullet dodging).

**11.** Sycamore Networks, Inc., Proxy Statement (Schedule 14A), at 9 (November 17, 2005).

**12.** *Id.*

Notably, neither Deshpande nor Smith received any of the options disputed in this case. In fact, neither of them own options in Sycamore. They simply own, between them, nearly a third of the corporation's common stock.

The other four Sycamore directors (the "Outside Directors") are directors who would, plaintiff Desimone must concede, be deemed independent for all purposes, save in situations when they have a personal interest at stake. The four Outside Directors are defendants Timothy Barrows, Paul Chisholm, Paul Ferri, and John Gerdelman. Their only compensation for board service is their receipt of stock options under a stockholder-approved option plan.[13] All of the "Director Defendants" have served on Sycamore's board since 1998, except for defendant Chisholm, who joined the board in 2002.

Desimone's demand excusal arguments stress two of Sycamore's board committees, the Compensation Committee and the Audit Committee. At all relevant times, the Compensation Committee consisted of two board members, defendants Barrows and Ferri. At various times, each of defendants Barrows, Ferri, Chisholm, and Gerdelman has served on the three-member Audit Committee.

The complaint also names as defendants five of Sycamore's executive officers. Each of the "Officer Defendants" is alleged to have received one or more back-dated options grant. The complaint focuses in particular on one of the Officer Defendants, Francis Jewels. Jewels was Sycamore's Chief Financial Officer, Treasurer, Secretary, and Vice President of Finance and Administration from 1999 until her resignation effective October 5, 2004. She is alleged to have been the "enforcer" and overseer of the illicit plan to backdate the Employee Grants.[14]

### B. Sycamore's Stockholder–Approved Option Plans

All of the challenged stock options grants were issued under authority of one of two stockholder-approved stock option plans: a Non–Employee Director Stock Option Plan (the "Outside Director Plan") and a Stock Incentive Plan (the "Incentive Plan").[15]

The Outside Director Plan automatically granted 30,000 options to each of Sycamore's Outside Directors each year on the date of Sycamore's annual stockholders meeting.[16] The Outside Director Plan also required that the exercise price of those options be equal to 100% of the fair market value of Sycamore's stock on the date of the grant.[17] The options granted under the Outside Director Plan were immediately exercisable, but were subject to a three year vesting schedule that prevented the recipients from realizing any immediate value from the options. Under the schedule, a third of the options vested after one year, another third after two years, and the last third three years from the date of

---

**13.** According to its public disclosures, Sycamore does not provide any compensation other than stock option grants to its directors for serving on the board. *See* Sycamore Networks, Inc., Proxy Statement (Schedule 14A) at 12 (Nov. 6, 2000).

**14.** Amended Derivative Action Complaint ("Complaint") at ¶ 24.

**15.** Although the stock option plans are not attached to the complaint, the complaint relies heavily on these documents and indeed (mis)quotes them. They are incorporated by reference into the complaint and are properly before me on this motion. *E.g., Albert v. Alex. Brown Management Services, Inc.,* 2005 WL 1594085, at *12 (Del.Ch.2005).

**16.** Outside Director Plan at § 4.

**17.** *Id.*

the grant. Until the options vested, the recipient was effectively prevented from selling or attempting to borrow against any shares acquired by exercising the options.[18]

The terms of the Incentive Plan, under which all of the challenged Officer and Employee Grants were made, has more moving parts and therefore demands a bit more description. The first important aspect of the Incentive Plan involves who was charged with administering it. The Incentive Plan states that "[t]he Plan will be administered by a committee or committees appointed by the Board of Directors of the Company ... and consisting of two or more members of the Board."[19] Importantly, it also provides:

> To the extent permitted by applicable law, the Board may delegate to one or more executive officers of the Company the power to grant Stock Rights and exercise such other powers under the Plan as the Board may determine, provided that the Board shall fix the maximum number of shares subject to Stock Rights and the maximum number of shares for any one participant to be made by such executive officers.[20]

In other words, with few limitations, the Incentive Plan contemplated that Sycamore's directors themselves might have a

very limited role in making certain options grants by permitting the board to delegate its authority under the Plan to Sycamore's executive officers. The complaint alleges no facts regarding how Sycamore implemented the Incentive Plan, who was charged with administering it, and whether, and to which, executive officers the board delegated any option-granting responsibilities.

Importantly, the Incentive Plan differs from the Outside Director Plan in that it does not require that all options grants be priced at fair market value on the date of the grant. Rather, the Incentive Plan merely states that the exercise price per share will be set at the discretion of those charged with administering the Plan.[21] To be clear that the Incentive Plan contemplated issuance of non-fair-market-value options, the options pricing section of the Plan contains a carve-out requiring only that options intended to qualify as incentive stock options under § 422(b) of the Internal Revenue Code or as performance-based compensation under § 162(m) of the Internal Revenue Code be priced at no less than 100% of fair market value on the option grant date.[22] Although the complaint alleges that both Plans, the Outside Director Plan and the Incentive Plan, required options to be priced at fair market

---

18. *Id.* at § 10(b) ("In the event the optionee ceases to be a member of the board for any reason, with or without cause, or if the optionee ... attempts to sell, exchange, transfer, pledge, or otherwise dispose of ... any shares acquired upon exercise of the option which exceed the optionee's Vested Shares, the Company shall have the right to repurchase the Unvested Shares.... The purchase price per share being repurchased by the Company shall be an amount equal to the optionee's original cost per share.").

19. Incentive Plan at § 2A.

20. *Id.* at § 2C.

21. Incentive Plan at § 7.

22. *Id.* Sections 422(b) and 162(m) of the Internal Revenue Code, 26 U.S.C. §§ 422(b) & 162(m), condition the favorable income tax treatment for certain types of stock options on several prerequisites, one of which is that the options be priced at no less than fair market value on the date of the grant. Section 422(b) permits the recipient of a qualifying option grant to recognize no income as a result of the grant if the corporation does not take a deduction attributable to it. Under § 162(m), performance-based compensation, which can include certain market-price stock options, is exempt from the otherwise applicable rule that an employer cannot deduct compensation to any single employee in excess of $1 million.

value on the date of grant, the clear language of the Incentive Plan contradicts that allegation.[23]

The complaint does not allege that any of the challenged Grants were intended to qualify under § 162(m) or § 422(b). That said, the complaint fairly implies that Sycamore accounted for all of the Employee and Officer Grants issued under the Incentive Plan as having been priced at fair market value on the date of grant, and having led stockholders, the market more generally, the recipients, and securities and tax regulatory authorities to believe that the favorable accounting[24] and tax treatment available for fair-market-value-based grants applied to the Grants now under attack.

The Incentive Plan also differs from the Outside Director Plan in that it gives Sycamore's Compensation Committee discretion to set the vesting schedule for any grants made under the Incentive Plan. Plaintiff Desimone has alleged, however, that all of the Employee and Officer Grants were made with a three year vesting schedule in which the shares vested in equal quarterly installments.[25] As was the case with the Outside Director Plan, recipients of Grants under the Incentive Plan were precluded from realizing any immediate value from unvested options because any shares acquired by exercising unvested options were subject to a repurchase right in favor of Sycamore at the option exercise price.

### C. The Revelation of Sycamore's Backdating Scheme

Sycamore's options practices became controversial when Sycamore's former Director of Human Resources, Stephen Landry, publicly accused Sycamore of backdating options. Having foregone any effort to obtain books and records using his statuto-

---

**23.** See In re Wheelabrator Tech's, Inc. S'holders Litig., 1992 WL 212595, at *3 (Del.Ch. 1992) ("The Court is hardly bound to accept as true a demonstrable mischaracterization and the erroneous allegations that flow from it."); see also Malpiede v. Townson, 780 A.2d 1075, 1083 (Del.2001) ("A claim may be dismissed if allegations in the complaint or in the exhibits incorporated into the complaint effectively negate the claim as a matter of law.").

**24.** Under generally accepted accounting principles ("GAAP") prevailing during the time of the Grants challenged in the complaint, a corporation did not have to recognize any compensation expense associated with grants of stock options when the exercise price of the options was equal to or greater than the fair market value of the company's stock on the date of the grant. By contrast, when a company granted options with a below-market exercise price, it was required to recognize a non-cash expense in the amount of the difference. See Accounting Principles Board Opinion No. 25, Accounting For Stock Issued to Employees (Oct.1972). In December 2004, the Financial Accounting Standards Board issued a new Statement of Financial Account Standard ("SFAS") 123R, which, going for-

ward, will require public companies to account for stock option grants under a new "fair value" standard. Public companies will have to recognize compensation expense even for market-value options. Some commentators suggest that this change will likely not have much effect on backdating practices. See, e.g., David I. Walker, Some Observations on the Stock Options Backdating Scandal of 2006 30 (Boston University School of Law, Working Paper Series, Law and Economics Working Paper No. 06–31, 2006), available at http://ssrn.com/abstract=929702 ("I would expect [SFAS 123R] to have zero effect on backdating or other option pricing manipulation. Backdating may have been about stealth compensation, but it was never really about reported earnings per share.").

**25.** Complaint at ¶ 44. This allegation is consistent with Sycamore's public disclosures regarding the Officer Grants, which state that those Grants vested in periodic installments over a three-year period. See Sycamore Networks, Inc., Proxy Statement (Schedule 14A) at 13 (Nov. 16, 2001); Sycamore Networks, Inc., Proxy Statement (Schedule 14A) at 9 (Nov. 12, 2002).

ry right of access, plaintiff Desimone largely bases his complaint on Landry's accusations and other public documents.

Because Desimone depends so heavily on Landry, a recitation of Landry's contentions is unavoidable. Sycamore hired Landry in October 1999 and allegedly "eased him out" of the company in the fall of 2000.[26] Upon his exit, Landry entered into a severance agreement with Sycamore, which he negotiated with defendant Francis Jewels, Sycamore's then-CFO. That severance agreement granted Landry a number of stock options. When Sycamore's stock price declined sharply in the following years, those options went underwater and Landry's severance package became worthless.

In late 2004, after Jewels had left Sycamore's employ, Landry wrote a letter to defendant Deshpande, Sycamore's Chairman, hoping to renegotiate the severance agreement. Landry succeeded in getting a meeting with Sycamore's new CFO and tried to use his knowledge of Sycamore's options backdating practices as leverage. Landry told a story in which Jewels was the boss and he was an underling in a conspiracy to backdate options grants. Jewels allegedly instructed Landry repeatedly to alter and falsify human resources documents in order to corroborate falsified options grant dates. Often, this was accomplished by forging personnel file

documents to change a newly-hired employee's start date to correspond to the date on which Jewels had determined to backdate the Employee Grant.

In early 2005, Landry presented Sycamore with the Internal Memo, penned by an unknown author in early 2001, that discusses the fact that options granted to six Sycamore employees were either deliberately altered to reflect a grant date of December 21, 2000, the date on which the stock price hit its low for the quarter, or were cancelled and reissued with a December 21, 2000 effective date.[27] Sycamore's stock price on December 21, 2000 was $29.125, down from $56.94 ten days earlier. Within the next twenty days, the stock price increased 76.4% to $51.38. According to the complaint, the manipulation of grant dates allowed the employees receiving options to reap a substantial and instant paper gain. But, as Desimone concedes, the options were subject to a three-year vesting schedule, and could not be used as collateral, precluding immediate realization of that gain.[28]

The Internal Memo separately discusses each of the six employees' options and suggests various courses of action designed to cover up the fact that the grant dates were being manipulated. Substantial covert actions were detailed to avoid having the backdating operation detected,[29] and the Memo makes a "risk assess-

---

**26.** Complaint, Ex. A at 4–5.

**27.** *See* Complaint, Ex. B.

**28.** In fact, according to the complaint, by early April 2001, just over three months after the December 2000 Grants, Sycamore's stock price was trading below $10 per share and has never recovered to the price it was at on December 21, 2000. By the time the first installment of the December 21, 2000 Grants vested, they were underwater and have never gotten back into the money. Given that Sycamore's stock is currently trading between $3 and $4 per share, in order for the recipients

of the December 2000 Grants to realize any value from their options, Sycamore's stock price must increase nearly 1000% before the options expire in December 2010.

**29.** For example, with respect to a newly hired employee in Sycamore's legal department whose option grant date was manipulated, the Internal Memo states: "Requires new offer letter for the file to adjust the salary difference from her actual date of hire 11/27/00 and 12/21/00. Adjustment will be addressed in the offer letter in the form of a sign on bonus." *Id.*

ment" for the actions taken with respect to each employee. The Memo considered many of the cover-up actions to be "low risk." For example, for one of the employees, the Memo states,

> She is a rank and file employee and the Company has no prior experience with her (although she does have a relationship with [another Sycamore employee] that could work to our advantage should the risk of exposure on this agreement surface). Low audit risk (exposure on payroll registers and on the medical insurance effective dates, both of which will remain unchanged, however, the auditors never reference these documents in their audits).[30]

For others, the risk was higher: "There is an audit risk since the grant was originally issued in Q1 and the cancellation occurred after the Q1 audit. Q1 options will not balance to audit records and diluted shares outstanding for Q1 will not balance."[31]

Upon learning of the Internal Memo, Sycamore's Audit Committee launched an investigation into Sycamore's historic accounting for stock options grants. That investigation revealed a number of options grants between 1999 and 2001 that were incorrectly accounted for under GAAP. According to Sycamore's recent public disclosures, the improperly-accounted-for grants included six new employee options grants in which employment start date records were deliberately modified to provide lower exercise prices and six existing stock options grants that were deliberately cancelled and reissued to provide for lower exercise prices.[32] The investigation also revealed an issue regarding a grant of options to several employees purportedly made on April 14, 2000, "where, from a review of supporting records, it appeared that the number of options granted likely was not ultimately determined until April 26, 2000."[33] In other words, the options were granted on April 26, 2000, but backdated to April 14. April 14, 2000, like December 21, 2000, was allegedly an auspicious grant date. Sycamore's stock price was $59, down from $129 ten days earlier. Within the next twenty days, the stock price increased 45% to over $74.[34] Again, Desimone claims that this means that the options recipients immediately made a $15 per share profit. But the vesting and other restrictions applicable to the Grants precluded the recipients from realizing it.

As a result of the investigation, Sycamore restated its earnings for fiscal years 2000–2003. The reason for the restatement was that the corporation had accounted for a large number of options as having been granted at fair market value on the date of the grant when in fact they had been granted at a later date than was reported, a later date when the fair market value of the corporation's shares was higher than the reported grant date. When accurately accounted for, these "in the money grants" had to be reflected as a non-cash charge on the company's balance sheet, thus reducing the earnings previously reported. In sum, with the bulk of the adjustment applied to fiscal year 2001, Sycamore took an additional $29.9 million

---

30. *Id.*

31. *Id.*

32. Although the complaint asserts at ¶ 50 that these improper Grants occurred in 2004, that allegation is directly refuted by the very document that it relies on for that proposition, Sycamore's Amended Form 10–K/A for the fiscal year ended July 21, 2004. That document, at page 51 makes clear that the improperly-accounted-for options grants were made from 1999 to 2001, not in fiscal year 2004. Sycamore Networks, Inc., Annual Report (Form 10–K/A), at 51 (September 12, 2005).

33. Complaint at ¶ 32.

34. *Id.* at ¶ 45.

non-cash charge. At the conclusion of the initial stage of the investigation, Sycamore did not penalize any officer, director, or employee, and no option recipient lost her option grant, although it appears some have agreed to re-price some of their options.[35]

As an alternative manner of sustaining his complaint, Desimone attempts to base a claim on the supposed inadequacy of the board's ongoing investigation of Landry's allegations and the broader subject of the company's options practices. I deal with that contention in the final section of this opinion.

### III. The Defendants' Dismissal Arguments

Three major arguments for dismissal are advanced by the Director Defendants. First, the Director Defendants argue that Desimone lacks standing under 8 *Del. C.* § 327 to challenge most of the option Grants because he did not become a Sycamore stockholder until after they were made. Second, the Director Defendants contend that Desimone's derivative claims must be dismissed because he did not make a demand on Sycamore's board and has failed to plead demand excusal with the particularity required by Court of Chancery Rule 23.1. Third, the Director Defendants argue that Desimone's allegations fail to state a claim under Rule 12(b)(6). I address these arguments in turn, beginning with the Director Defendants' standing argument.

### IV. Desimone Lacks Standing To Challenge The Pre–2002 Options Grants

Section 327 of the Delaware General Corporation Law requires that a derivative plaintiff have been "a stockholder of the corporation at the time of the transaction of which [he] complains." [36] The complaint alleges that Desimone has owned 700 shares of Sycamore common stock since February 4, 2002. Desimone concedes that all but two of the allegedly improper options Grants were made before he became a stockholder.[37] The only Grants that occurred after Desimone acquired his stock were a set of Officer Grants that occurred in April 2002 and a set of Outside Director Grants in December 2003. Desimone nonetheless contends that he has standing to challenge *all* of the Grants, including those that occurred before he became a stockholder because the conduct alleged in the complaint supposedly involves a pattern of "continuing wrongs" persisting into the time period when he was a stockholder. The pattern of wrongs that Desimone describes allegedly includes the cover up of the prior wrongs, the limited scope of the internal investigation, the financial restatements, and the failure to require the recipients of the Grants to disgorge them.[38] Read fairly, though, Desimone's argument boils down to an assertion that there is a continuing wrong because similar backdating activity occurred, and Sycamore's backdating operation was revealed, after he bought his stock.

■ The scope of the continuing wrong doctrine, as applied to § 327, has never been defined by Delaware courts with much precision.[39] This court's written de-

---

**35.** On December 29, 2006, Sycamore announced that Kevin Oye, an Officer Grant recipient, had agreed to re-price 166,667 of the 1 million options he received in April 2002. Sycamore Networks, Inc., Current Report (Form 8–K) (December 29, 2006).

**36.** 8 *Del. C.* § 327.

**37.** Complaint at ¶ 13.

**38.** Complaint at ¶ 14.

**39.** There is, however, a substantial body of law addressing the similar issue of when a course of conduct involves a continuing wrong for purposes of the beginning of the running of a statute of limitations. *See, e.g., Kahn v. Seaboard Corp.,* 625 A.2d 269, 271 (Del.Ch.1993) (discussing the continuing wrong doctrine in the context of deciding

cisions, though, do suggest that the doctrine is a narrow one that typically is applied only in unusual situations, such as where a plaintiff acquires his stock after a particular transaction has begun but before it is completed.[40] What is clear is that it is not, as the plaintiff would seek to characterize it, a sweeping exception to the contemporaneous ownership requirement of § 327. Importantly, the continuing wrong doctrine does not bestow standing upon a stockholder to challenge transactions occurring before he bought his stock simply because they are similar or related to transactions or other conduct that occurred later.[41] This court has traditionally been skeptical about the type of continuing wrong allegations made here and has refused to blind itself to the fact that a plaintiff was actually challenging a discrete series of individual transactions that pre-dated his stock ownership.[42]

■■■ In this regard, the name placed on the doctrine by Desimone, the "continuing wrongs doctrine" is not accurate in its use of the plural "wrongs." The fact that other wrongs have later occurred does not afford a plaintiff standing to challenge earlier wrongs that pre-date his stock ownership, even though they may be similar or related. Rather, in the analogous context of applying the doctrine to determine when a statute of limitations will begin to run, our Supreme Court has made it clear that the concept of a continuing *wrong* applies only when "the alleged wrongful acts are ... so inexorably intertwined that there is ... *one continuing wrong*."[43] In the same vein, it is settled that the failure to remedy a wrong does not mean that the wrong is continuing.[44]

when the statute of limitations would begin to run in a shareholder derivative action). That jurisprudence deals with an issue analogous to the question before me and I am influenced by it in deciding this question. That body of case law does not treat a series of similar but discrete transactions as a continuing wrong. *Ewing v. Beck*, 520 A.2d 653, 664 (Del.1987) (noting that if a continuing wrong can be segmented, the applicable statute of limitations will apply to each alleged wrong and not to the course of wrongful conduct as a whole). Rather, the well-accepted rule in the statute of limitations context is that the statute of limitations for each discrete wrongful transaction begins to run upon the occurrence of each transaction, and a plaintiff can only challenge those transactions, or other wrongful acts, that occurred within the limitations period. *E.g., Kahn*, 625 A.2d at 271; *Price v. Wilmington Trust Co.*, 1995 WL 317017, at *2 (holding, in a case involving multiple breaches of fiduciary duty by a trustee, that the continuing wrong doctrine does not apply where "there are alleged to be numerous repeated wrongs of similar, if not the same, character over an extended period").

40. *See, e.g., Lavine v. Gulf Coast Leaseholds, Inc.*, 122 A.2d 550, 551–52 (Del.Ch.1956)

(holding that a plaintiff had standing to challenge a stock exchange agreement that was subject to shareholder approval where he became a stockholder after the agreement was executed but before the shareholder vote because the agreement had no effect until approved).

41. *Newkirk v. W.J. Rainey, Inc.*, 76 A.2d 121, 123 (Del.Ch.1950).

42. *See id.* ("Although a conspiracy ... is alleged, ... the fact is that plaintiffs complain of and seek relief with respect to three specific transactions.... The allegation of a conspiracy cannot obscure the hard fact that the [individual transactions] are the wrongs which plaintiffs want rectified.").

43. *Ewing*, 520 A.2d at 662 (emphasis added).

44. *Newkirk*, 76 A.2d at 123 ("Of course, in one sense every wrong wrongful transaction constitutes a continuing wrong to the corporation until remedied. But if the rule embodied in [§ 327] is to be meaningful, then clearly 'continuing wrong' cannot be construed in such as sense because it would substantially defeat the statutory [purpose].").

■ The problem for Desimone is that each of the wrongs, if they be that, he claims occurred after he became a stockholder can be easily segmented from any wrongs that occurred before. As explained in *Elster v. American Airlines*, the granting of a stock option is an individual transaction that is completed the moment the options are granted.[45] Consistent with *Elster*, this court recently held, in *Ryan v. Gifford*, that a plaintiff lacked standing to challenge backdated options grants occurring before he acquired his shares even though similar backdated grants continued to be made after the plaintiff became a stockholder.[46] Similarly, that there was a restatement of operating results issued during the period when Desimone was a stockholder related to options grants occurring before his purchase of shares does not puree the prior grants into an undifferentiated bisque of "continuing wrongs."[47] Likewise, over a half-century ago in *Newkirk v. W.J. Rainey, Inc.*, this court explained that the cover up of a wrong cannot be intertwined with the wrong itself lest § 327 be rendered impotent.[48] Such an allegation cannot be used by a late-acquiring stockholder-plaintiff to attack the prior transactions because if it could,

§ 327 would be effectively repealed by judicial sloppiness. For the same reason, Desimone's alternative contentions about Sycamore's alleged failure to adequately investigate the prior wrongful conduct cannot give rise to a single continuing wrong, enabling him to challenge the option Grants completed before he acquired his shares.

I also reject Desimone's broader policy-based arguments, which are premised on the notion that although § 327's plain words deny him standing, § 327 should be ignored here because he was ignorant of the backdating activity. The primary public policy purpose for the statute, says Desimone, is to prevent plaintiffs from purchasing shares in order to maintain a derivative action attacking transactions that occurred before the purchase. Clearly Desimone had no such purpose when he bought his stock because he was unaware of the wrongful activity, thus he says § 327 should be deemed inapplicable.

Although this court has often recognized that a primary purpose of § 327 is to prevent plaintiffs from buying stock in order to maintain a derivative suit,[49] there is no indication in the unambiguous text of the statute that that is its only purpose or

45. 100 A.2d 219, 224 (Del.Ch.1953) (stating in a case seeking to challenge stock option grants made before the plaintiff became a stockholder: "The wrong or injury of which plaintiff complains is the granting of the options.... The action is therefore not a continuing one.").

46. *Ryan*, 918 A.2d at 358–59; *see also Bird v. Lida*, 681 A.2d 399, 406 (Del.Ch.1996) (holding that a stockholder who bought stock after a corporation had entered into an above-market lease with certain of its directors did not have standing to challenge the fairness of the lease even though the lease continued into the period of the plaintiff's stock ownership because the wrong complained of was the act of entering into the lease; the corporation's failure, during the time of the plaintiff's stock ownership, to attempt to renegotiate the

terms of the unfair lease did not constitute a continuing wrong).

47. *See Chirlin v. Crosby*, 1982 WL 17872, at *2–3 (Del.Ch.1982) ("The allegations of a continuing wrong ... merely attempt to obscure the fact that the plaintiffs are actually complaining about the alleged diversion which took place [before the plaintiff acquired his stock].").

48. 76 A.2d 121, 123 (Del.Ch.1950).

49. *See, e.g., Maclary v. Pleasant Hills, Inc.*, 109 A.2d 830, 833 (Del.Ch.1954) (stating that the statute was "designed principally to prevent the purchasing of stock to be used for the purpose of filing a derivative action attacking transactions occurring prior to such purchase").

that a plaintiff has standing when he otherwise would not simply because he was ignorant of the wrongdoing before he acquired the stock. This court cannot supplant the plain language of a Delaware statute with conjecture about that statute's underlying public policy.[50] Indeed, Desimone does not cite to any legislative history underlying the enactment of § 327, in support of his public policy argument, but rather to decisions of this court that merely attempt to explain the statute. Those decisions could not and did not alter the plain language of the statute. Section 327 is clear that stock ownership at the time of challenged conduct is a prerequisite to maintaining a derivative action and the General Assembly has not legislated a "state of mind exception" to that requirement.[51] Therefore, because Desimone did not buy Sycamore stock until February 2002, he lacks standing to challenge all of the options Grants that occurred before he became a Sycamore stockholder.[52]

## V. The Complaint's Allegations About Sycamore's Stock Options Practices

Because Desimone does have standing to challenge two of the options Grants identified in the complaint, I cannot avoid addressing those Grants. Because I have to do that anyway, in the interests of efficiency, I evaluate more generally whether the entire complaint must be dismissed under either Rule 23.1 for failure to make a demand or Rule 12(b)(6) for failure to state a claim.

### A. Legal Standards

Before embarking on an analysis of Desimone's allegations, I lay out the applicable legal standards.

#### 1. Rule 23.1

■ Because Desimone did not make a demand on Sycamore's board, the complaint must plead particularized factual

---

**50.** *See, e.g., In re Last Will and Testament of Palecki*, 920 A.2d 413, 421–22 (Del.Ch.2007).

**51.** Implementing the statute as written might also serve another purpose, which is to distinguish among *plaintiffs* based on the nature of their claims. The shareholders at the time of the wrong are the only persons who are harmed in a derivative sense by the wrong to the company itself. Here, for example, Desimone was not injured derivatively by the Grants that pre-dated his purchase, in the sense that his existing stockholdings were devalued as a result of the wrongs committed against the company. *His injury, if he was* injured at all, was instead a direct injury to *himself as a purchaser of Sycamore's shares* in the market because he bought Sycamore stock while he, and the rest of the market, were ignorant of the harm that had already allegedly befallen the company and believed that Sycamore's earnings were higher than they actually were. Desimone, himself, thus arguably overpaid for the Sycamore shares that he bought and was injured in that direct sense. *Desimone's claim is more in the na-*ture of a cause of action based on a fraud on the market theory—i.e., that Desimone and all of the other similar purchasers of Sycamore stock overpaid for their stock because Sycamore made false disclosures about its accounting for stock options. Precluding Desimone from asserting claims on behalf of Sycamore based on allegedly improper stock option Grants that pre-dated his status as a stockholder arguably best comports with our Supreme Court's recognition that a fraud on the market claim is properly pursued only in federal court under the federal securities laws. *See Malone v. Brincat*, 722 A.2d 5, 13 (Del.1998) (noting that "[i]n deference to the panoply of federal protections that are available to investors in connection with the purchase or sale of securities of Delaware corporations, [Delaware courts have] decided not to recognize a state common law cause of action against the directors of Delaware corporations for 'fraud on the market' ").

**52.** Notably, five related shareholder derivative actions remain pending in Massachusetts Superior Court and the United States District Court for the District of Massachusetts.

allegations establishing demand excusal.[53] All of the parties agree that the standard for determining demand excusal in this case is set forth in *Rales v. Blasband.*[54] Under *Rales,* demand is excused where the complaint "creates a reasonable doubt that, as of the time the complaint is filed, the board of directors could have properly exercised its independent and disinterested business judgment in responding to a demand."[55] The *Rales* test is a two-prong inquiry requiring courts to analyze whether a complaint pleads particularized facts sufficient to demonstrate that either (1) the underlying conduct being challenged renders any of the directors "interested" and, if so, whether any of the other directors are compromised in their ability to act independently of the interested directors; or (2) at least half of the directors face a sufficiently substantial threat of personal liability as to the conduct alleged in the complaint to compromise their ability to act impartially on a demand.[56] In engaging in this inquiry, I confine myself to the well-pled allegations of the complaint,[57] to the documents incorporated into the complaint by reference,[58] and to judicially-noticed facts.[59] I draw all rea-sonable inferences from the complaint's non-conclusory factual allegations in Desimone's favor.[60] But I do not accept cursory contentions of wrongdoing as a substitute for the pleading of particularized facts.[61] Mere notice pleading is insufficient to meet the plaintiff's burden to show demand excusal in a derivative case.[62]

## 2. *Rule 12(b)(6)*

■ The Rule 12(b)(6) standard, like the Rule 23.1 standard, requires me to accept all well-pled allegations of fact as true and draw all reasonable inferences in Desimone's favor.[63] The difference between the 12(b)(6) and 23.1 standards is in the level of detail demanded of the plaintiff's allegations.[64] On a 12(b)(6) motion, particularity in fact pleading is not required. Nonetheless, to survive a Rule 12(b)(6) motion, a complaint alleging breach of fiduciary duty must plead facts supporting an inference of breach, not simply a conclusion to that effect.[65] As the United States Supreme Court recently explained in *Bell Atlantic Corp. v. Twombly,*[66] the realities of modern complex litigation make proceeding past the pleading stage and into discovery exceedingly ex-

**53.** *E.g., Guttman v. Huang,* 823 A.2d 492, 499 (Del.Ch.2003); Court of Chancery Rule 23.1.

**54.** 634 A.2d 927 (Del.1993). *See* Plaintiff's Answering Brief at 16; Director Defendants' Opening Brief at 7–9.

**55.** *Id.*

**56.** *Guttman,* 823 A.2d at 501–03.

**57.** *E.g., White v. Panic,* 783 A.2d 543, 547 (Del.2001).

**58.** *E.g., Albert v. Alex. Brown Management Services, Inc.,* 2005 WL 1594085, at *12 (Del.Ch. 2005).

**59.** *See* Delaware Uniform Rules of Evidence 201(f) ("Judicial notice may be taken at any stage of the proceeding."); *In re Gen. Motors (Hughes) S'holder Litig.,* 897 A.2d 162, 170 (Del.2006) (upholding trial court's consideration, on a motion to dismiss, of SEC filings used to ascertain facts appropriate for judicial notice).

**60.** *E.g., White,* 783 A.2d at 547 n. 5.

**61.** *Grobow v. Perot,* 539 A.2d 180, 187 (Del. 1988).

**62.** *Guttman,* 823 A.2d at 499.

**63.** *E.g., In re Lukens, Inc. Shareholders Litig.,* 757 A.2d 720, 727 (Del.Ch.1999).

**64.** *Tyson,* 919 A.2d at 582.

**65.** *Id.*

**66.** —— U.S. ——, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007).

pensive.[67] In light of that, our nation's high court has now embraced the pleading principle that Delaware courts have long applied, which is that a complaint must plead enough facts to plausibly suggest that the plaintiff will ultimately be entitled to the relief she seeks.[68] If a complaint fails to do that and instead asserts mere conclusions, a Rule 12(b)(6) motion to dismiss must be granted.[69]

With those standards in mind, I turn to the substantive issues raised by Desimone's allegations.

### B. Options Backdating Under Delaware Law

This court recently had occasion to consider issues similar to the ones presented here in its carefully-reasoned and well-written decisions, *Ryan v. Gifford*[70] and *In re Tyson Foods, Inc. Consol. S'holders Litig.*[71] Therefore, before engaging in an analysis of the challenged Grants, a brief discussion of those cases is in order.

In *Ryan*, Chancellor Chandler held that when a stockholder-approved stock option plan requires all options to be granted with current market exercise prices, a director acts disloyally by knowingly approving backdated options.[72] As the Chancellor explained, representing to the company's shareholders, the public markets, and regulatory authorities that an option grant was given at fair market value on the date of the grant when in fact the option was backdated to an earlier time when the stock price was lower, involves a "fundamental, incontrovertible lie."[73] In that regard, the Chancellor noted that "it is difficult to conceive of a context in which a director may simultaneously lie to his shareholders ... and yet satisfy his duty of loyalty."[74]

In *Ryan*, the plaintiff alleged that a three-member compensation committee, which amounted to half of the six-member board, knowingly backdated the option grants at issue and that a fourth director was interested in the option grants because he was the one who received them and did so knowing that they were backdated.[75] The Chancellor thus applied the *Aronson* standard for demand excusal and held that demand was excused because at least half of the board participated in the decision to backdate options and that a knowing violation of a stockholder-approved option plan was not a valid exercise of business judgment.[76] Alternatively, the Chancellor held that demand would also be excused under the *Rales* standard because the directors who knowingly approved or received backdated options grants faced a substantial likelihood of personal liability for breaching their fiduciary duty of loyalty.[77]

*Tyson* considered a different issue. In that case, the directors were not alleged to have backdated any option grants, but

---

67. *Id.* at 1966.

68. *Id.; accord Tyson,* 919 A.2d at 582 n. 36 (explaining the utility of requiring the pleading of *facts* that state a claim, rather than conclusions in the derivative action context); *Harbor Finance Partners v. Huizenga,* 751 A.2d 879, 892 (Del.Ch.1999) (explaining that to state a claim in stockholder derivative action, a plaintiff must plead specific facts that, if proven, plausibly suggest he will prevail).

69. *E.g., Kohls v. Kenetech Corp.,* 791 A.2d 763, 767 (Del.Ch.2000).

70. 918 A.2d 341 (Del.Ch.2007).

71. 919 A.2d 563 (Del.Ch.2007).

72. *Ryan,* 918 A.2d at 355.

73. *Tyson,* 919 A.2d at 592.

74. *Ryan,* 918 A.2d at 355.

75. *Id.* at 348.

76. *Id.*

77. *Id.* at 356.

rather to have engaged in "spring load-ing." The allegation in *Tyson* was that the directors engaged in a pattern of behavior over a number of years whereby just before the company would issue a positive announcement that was likely to cause an increase in the company's stock price, a large discretionary award of stock options would be issued to key insiders, including several of the directors.[78] Also critical was the allegation that the stock option plan in *Tyson* required all option grants to be issued at fair market value. Based on those pled facts, the Chancellor held that the plaintiffs stated a breach of fiduciary duty claim against the directors who approved and who received the spring-loaded options. In so holding, the Chancellor noted that the plaintiffs had pled a very specific set of facts that satisfied the following requirements he articulated for premising a claim on spring loading: "First, a plaintiff must allege that options were issued according to a stockholder-approved employee compensation plan. Second, a plaintiff must allege that the directors that approved spring-loaded (or bullet-dodging) options (a) possessed material non-public information soon to be released that would impact the company's share price, and (b) issued those options with the intent to circumvent otherwise valid stockholder-approved restrictions upon the exercise price of options." [79]

As I understand it, the plaintiffs pled in *Tyson* that the option plan was sold to stockholders on the basis that options would be granted *not* as a reward for *past*

performance, but *only* to give incentives for recipients to work hard and well in the *future*. By allegedly using the plan as an undisclosed means to grant large discretionary bonuses, the *Tyson* defendants were accused of manipulative, secretive behavior at odds with the rationale for the plan—a rationale the stockholders were told by the defendants themselves. The Chancellor held that conduct of that precise kind raised, for pleading purposes, a claim for breach of fiduciary duty.[80]

In *Tyson,* demand was excused because the plaintiff pled with particularity facts to establish a reasonable doubt that the company's board as a whole was capable of acting independently of the individuals who knowingly received the spring-loaded options grants. As a result, the entire board was compromised in its ability to disinterestedly consider a demand challenging those grants.

### C. *Proceed With Care: The Legal Complexities Raised By Various Options Practices*

As in *Ryan* and *Tyson,* issues of back-dating and spring loading are presented here. But there are some very important differences between the allegations made here about the Employee, Officer, and Outside Director Grants, and those that were made in *Ryan* and *Tyson.* The first is that the Incentive Plan, the stockholder-approved option plan under which all of the Employee and Officer Grants were made, did not by its terms require that all options be priced at fair market value on the date of the grant. Rather, the Incen-

---

**78.** *Tyson,* 919 A.2d at 575–76.

**79.** *Id.*

**80.** One could also read *Tyson* as holding that the defendants consciously caused the corporation to breach the implied covenant of good faith and fair dealing in the option plan. By making an intentional decision to award a discretionary option grant before announcing

positive news they already possessed but that the markets did not, the defendants could be seen as exploiting an interstitial gap in a manner that clearly deprived the stockholders of the bargain they thought they had made. As I note a bit later, the fiduciary duty tool was necessary to employ to hold the non-recipient directors responsible for any harm created.

tive Plan gave Sycamore's directors discretion to set the exercise price of the options and expressly permitted below-market-value options to be granted. This case thus presents a different question than those involved in *Ryan* and *Tyson*, which is whether corporate officials breach their fiduciary duties when they, despite having express permission under a stockholder-approved option plan to grant below-market options, represent to shareholders, markets, and regulatory authorities that they are granting fair-market-value options when in fact they are secretly manipulating the exercise price of the option.

As to that question, there is also the subsidiary question of whether the means matters. For example, do backdating and spring loading always have the same implications? In this respect, the contraventions of stockholder-approved option plans that allegedly occurred in *Ryan* and *Tyson* are not the only cause for concern. The tax and accounting fraud that flows from acts of concealed options backdating involve clear violations of positive law.[81] But even in such cases, there are important nuances about *who* bears responsibility when the corporation violates the law, nuances that turn importantly on the state of mind of those accused of involvement.

That point highlights the second important difference between this case and *Ryan* and *Tyson*. In contrast to the plaintiff in *Ryan*, plaintiff Desimone has pled no facts to suggest even the hint of a culpable state of mind on the part of any director. Likewise, Desimone has not, as was done in *Tyson*, pled any facts to suggest that any director was incapable of acting independently of the recipients of any of the Employee or Officer Grants. The absence of pled facts of these kinds underscores the utility of a cautious, non-generic approach to addressing the various options practices now under challenge in many lawsuits. The various practices have jurisprudential implications that are also diverse, not identical, and the policy purposes of different bodies of related law (corporate, securities, and tax) could be lost if courts do not proceed with prudence. Indeed, within the corporate law alone, there are subtle issues raised by options practices.

By way of example, consider the concerns of some distinguished scholars about the boundaries between law and equity in this area. Those scholars posit that if directors violate the express terms of a stockholder-approved stock option plan, they have acted without authority and their actions may be set aside as invalid, because the directors did not have the authority to take those actions in the first place.[82] Therefore, these scholars see little room for the application of fiduciary principles to judge such behavior.[83] Un-

81. *See* Victor Fleischer, *Options Backdating Tax Shelter, and Corporate Culture* 2 (University of Colorado Law School, Legal Studies Research Paper Series, Working Paper No. 06–38, 2006), *available at* http://ssrn.com/abstract=939914 ("Options backdating violate[s] accounting rules and in many cases, the securities laws. It also violate[s] tax law.").

82. *See, e.g.,* Stephen M. Bainbridge, *Ryan v. Gifford: Chandler Tackles Stock Options*, at ProfessorBainbridge.com, http://www.professorbainbridge.com/2007/02/ryan—v—gifford.html (Feb. 7, 2007).

83. *E.g., id.* (arguing that if the backdated option grants are declared invalid as being *ultra vires*, there is no further harm to the corporation to justify derivative litigation against the board); *see also* Larry E. Ribstein, *Bainbridge and Chandler on Backdating*, at http://busmovie.typepad.com/ideoblog/2007/02/bainbridge—and—.html (Feb. 8, 2007) (agreeing that backdated options can be set aside as *ultra vires* and noting that although a disclosure violation would still remain, fashioning a remedy for the disclosure violation would be problematic).

derlying this fear, or so I perceive, is the justified concern that concepts of fiduciary duty not be used in an unprincipled and wholly-elastic way to reach any and all behavior that, upon first blush, strikes judges as inappropriate.

These scholars' concern about analytical rigor of this kind is one I embrace. But the common law of corporations cannot and should not fail to consider the fiduciary consequences of director behavior that involves a breach of contract or violation of law. In fact, I harbor that belief for reasons consistent with these scholars' concerns, particularly their concern that directors might otherwise be too lightly subjected to liability in situations involving alleged failures in exercising due care. Although the reasons for that belief cannot be set forth in full here, an example might illustrate why the rigorous application of legal and equitable concepts to the same transaction might be required to render the most just decision.

Assume a situation when a corporation, whose charter has an exculpatory provision authorized by 8 *Del. C.* § 102(b)(7), has consistently backdated options in violation of a stockholder-approved option plan. The backdating was concealed from stockholders through false accounting. But the option grants were to highly-educated researchers, none of whom were involved in the decision-making process regarding the grants of options. As is often the case with illegal schemes, this one was exposed. The corporation has had to restate its earnings, deal with tax authorities, and the employees who received the options are in an uproar about possible tax consequences.

A suit is filed to set aside the option grants. Suppose the court sets them aside as *ultra vires* for having been issued in violation of the stock option plan and orders disgorgement of any gains on exercised options. Put aside the question of whether the recipient employees would have a contract claim for damages. Assume as a business matter that the corporation has to make the recipients whole by compensating them for the loss of the options and profits, and any adverse tax consequences. After all, they are valuable employees who, through no fault of their own, found themselves in the midst of a controversy they did not create. They will be disgruntled if their reasonable expectations are not met.

The suit also contains allegations of breach of fiduciary duty and a claim for damages against the directors. The plaintiffs seek a remedy on behalf of the corporation for the costs of satisfying its employees, for the regulatory penalties it was forced to pay, and for the other economic consequences of the backdating, including, let's say, $12.5 million to cover the costs of the internal investigation.

In that circumstance, the appropriate measuring stick for director responsibility is that of equity. Why? Contrast these possible scenarios in which the board's compensation committee approves the options in question. In the first, which I will call "Scenario I," the compensation committee, although not acting with reasonable diligence, approves the option grants without realizing that the grants violate the terms of the stock option plan and without realizing that the corporation is accounting for them improperly. In fact, they are advised by the corporation's general counsel, HR director, and CFO that the grants were appropriate under the plan. The committee knew who was getting them, the incentives for performance they were intended to create, and the economic terms of the options, but it did not dig into the details, such as the actual date of the grants or the stock's trading price on those dates, after receiving reports from the key officers. Even assume that the committee signed a written consent or

two, circulated to them by company counsel.

In the second situation, which I will call "Scenario II," assume by contrast that the compensation committee approved options grants to newly-hired employees, but was aware that the stockholder-approved option plan required options to be issued at fair market value on the date of grant. The committee realized that this was problematic because depending on market fluctuations in the stock price, employees hired in the same quarter could end up with very different incentives. Being told that "everyone was doing it," the committee decided to approve a plan of systematically backdating options so that recipients would all have a strike price set at the lowest price of the quarter in which they were hired. The committee was aware that the options were being accounted for as if they were issued on the date used to set the strike price when they in fact were not. By that means, there was no balance sheet impact to the corporation. Of course, this involved accounting fraud and tax fraud, but a little of that was perceived by the committee to be the emerging American way.[84]

Without prejudging all the implications of these scenarios, it is fair to say that they present interesting questions about the culpability the compensation committee members have for harm caused to the corporation by the option grants. In Scenario I, there is a serious argument that the directors cannot be held liable in damages for breach of any duty. For starters, to find them liable for breach of fiduciary duty absent the exculpation clause, one would have to consider whether their failure to realize the impropriety of the options grants rose to a level of gross negligence, the higher threshold used by our law to analyze due care claims for several policy reasons that are well understood. But because they are protected by the exculpation clause, the directors can only be held liable if they act with a state of mind that is disloyal to their obligations to the corporation. In this context, that would likely require a finding that the compensation committee knew that the options violated the stock option plan and that the options were being accounted for in a manner that was improper,[85] or that their failure to obtain that information resulted from their knowing abdication of their directorial duties.[86] In other words, it is precisely by the careful use of equitable principles to analyze director conduct that directors are protected from liability in a situation when they did not act with scienter.

Likewise, in Scenario II, these principles reveal the directors' wide-open exposure to damages liability. Because the directors would have consciously taken action beyond their authority, they were, as explained in *Ryan* and *Tyson*, disloyal to the corporation. This is so even though their motives were not necessarily selfish. Although the directors may have had a reasonable business basis to provide the same incentives to all similarly situated employees, they did so using a technique (below-market options) that they had agreed not to use—and then lied about it. As the Chancellor explained in *Ryan* and *Tyson*, that deception is itself a disloyal act.[87]

---

84. *See* Fleischer, *supra* n. 81 at 2 (noting that the pervasiveness of options backdating, which involves clear tax fraud, is reflective of an overall culture of tax non-compliance in corporate America).

85. *E.g., Ryan*, 918 A.2d at 355 n. 35.

86. *E.g., Stone*, 911 A.2d at 370; *Guttman*, 823 A.2d at 506; *In re Caremark Int'l., Inc. Derivative Litig.*, 698 A.2d 959, 971 (Del.Ch.1996).

87. If the directors wanted to ensure that all employees hired around the same time have options with the same strike price, they could do so without violating the price restrictions of a stockholder-approved option plan by pro-

By contrast, in a situation where directors are expressly permitted under the terms of a stockholder-approved option plan to issue below-market options, it would be well within the realm of business judgment to choose to issue all options to a set of similarly-situated employees at a uniform strike price reflecting the stock's low point for the quarter. But even in that situation, a director could not, with impunity, secretly backdate the option grants while falsely representing that they were made at fair market value on the dates of the grants or account for them as such. As illustrated by the financial restatements issued by Sycamore, options backdating has serious accounting implications and unless the options grants are properly accounted for—which would require taking a non-cash charge against earnings in the amount of the difference between the market price on the actual dates of the grants and the exercise price that reflects the earlier—lower trading prices, a consistent practice of options backdating can cause a company's financial statements to be materially misleading.[88] This can expose the company to the regulatory consequences and civil and criminal liability that stem from knowingly issuing false earnings reports. Moreover, the tax

implications of backdating cannot be ignored, and unless the company accounts for the backdated grants on its tax returns as below-market grants, it could in some circumstances be found to have taken deductions to which it was not entitled. Alternatively, to the extent the recipients of the options do not recognize income to reflect the receipt of a below-market grant, they would be exposed to both additional taxes and penalties. In those situations, the company might be forced as either a legal or practical matter to make the affected employees whole, at the corporation's expense.

■ ■ In short, by consciously causing the corporation to violate the law, a director would be disloyal to the corporation and could be forced to answer for the harm he has caused. Although directors have wide authority to take lawful action on behalf of the corporation, they have no authority knowingly to cause the corporation to become a rogue, exposing the corporation to penalties from criminal and civil regulators. Delaware corporate law has long been clear on this rather obvious notion; namely, that it is utterly inconsistent with one's duty of fidelity to the corporation to consciously cause the corporation to act unlawfully.[89] The knowing·use

viding that all options awarded to employees hired in a particular quarter be granted at fair market value as of the first day of the quarter after the one in which the employees were hired. The same goal is achieved without the granting of below-market options.

**88.** This was most clearly the case under the accounting rules that prevailed during the time in which the backdating at Sycamore occurred. At that time, companies that backdated options grants recognized no compensation expense associated with the backdated grants when, in fact, an expense equal to the amount by which the options were "in the money" should have been recognized. Even under the new accounting rules set forth is SFAS 123R, which require companies to recognize an expense in the amount of the "fair value" of the options grants as determined

under Black–Scholes or some other option valuation method, companies that secretly backdate options are likely to materially misstate their compensation expense because the fair value of an "in the money" option is likely higher than an option granted at a fair-market-value exercise price.

**89.** *E.g., In re Walt Disney Co. Derivative Litig.,* 906 A.2d 27, 67 (Del.2006) ("A failure to act in good faith may be shown ... where [a] fiduciary acts with intent to violate applicable positive law."); *Guttman,* 823 A.2d at 506 n. 34 ("[O]ne cannot act loyally as a corporate director by causing the corporation to violate the positive laws it is obliged to obey."); *Metro Communication Corp. BVI v. Advanced Mobilecomm Technologies, Inc.,* 854 A.2d 121, 131 (Del.Ch.2004) ("Under Delaware law, a fiduciary may not choose to manage an entity

of illegal means to pursue profit for the corporation is director misconduct.

■ In this same vein, the importance and utility of the Delaware Supreme Court's recent decision in *Stone v. Ritter*,[90] reinforcing the vitality of this court's decision in *In re Caremark Int'l Inc. Deriv. Litig.*[91] should not be ignored. Some respected scholars seem to fear that *Stone* opens directors to new kinds of claims foreclosed by *Caremark*,[92] while others read it as taking away a non-scienter based claim *Caremark* supposedly seemed to suggest.[93] Neither position seems entirely consistent with the decision itself. *Stone* clarified one of the most difficult questions in corporate law—when directors with no motivation to injure the firm can be held responsible if the corporation incurs serious harm as a result of its failure to obey the law. What *Stone* makes clear is that *Caremark* and its progeny, such as *Guttman v. Huang*,[94] are still good law. For reasons *Caremark* well-explained, to hold directors liable for a

failure in monitoring, the directors have to have acted with a state of mind consistent with a conscious decision to breach their duty of care. *Caremark* itself encouraged directors to act with reasonable diligence, but plainly held that director liability for failure to monitor required a finding that the directors acted with the state of mind traditionally used to define the mindset of a disloyal director—bad faith—because their indolence was so persistent that it could not be ascribed to anything other than a knowing decision not to even try to make sure the corporation's officers had developed and were implementing a prudent approach to ensuring law compliance.[95] By reinforcing that a scienter-based standard applies to claims in the delicate monitoring context, *Stone* ensured that the protections that exculpatory charter provisions afford to independent directors against damage claims would not be eroded.[96] *Stone* has obvious implications for cases like this, when a plaintiff seeks to hold directors accountable for fail-

in an illegal fashion, even if the fiduciary believes that the illegal activity will result in profits for the entity."); *see also* S. Samuel Arsht, *The Business Judgment Rule*, 8 HOFSTRA L.REV. 93, 129 (1979) ("Bad faith may preclude application of the business judgment defense where directors knowingly violate a statute or comparable expression of public policy, even if such a violation is undertaken in the corporation's best interests.").

90. 911 A.2d 362 (Del.2006).

91. 698 A.2d 959 (Del.Ch.1996).

92. *E.g.*, Stephen M. Bainbridge, *Stone v. Ritter: Directors' Caremark Oversight Duties*, at ProfessorBainbridge.com, http://www.professorbainbridge.com/2007/01/stone—v—ritter.html (Jan. 3, 2007) (suggesting that under *Stone*, a conscious decision by the board of directors that the costs of a formal law compliance program outweigh the benefits might result in *per se* liability).

93. *E.g.*, Eric A. Chiappinelli, Delaware Supreme Court on Good Faith (Again) and the

Duties of Care and Loyalty, at http://business entitiesonline.typepad.com/new—developments/2006/11/delaware—suprem. html (Nov. 8, 2006) (suggesting that *Stone* had undercut *Caremark's* recognition of an enforceable duty of care in the monitoring context).

94. 823 A.2d 492 (Del.Ch.2003).

95. *Caremark*, 698 A.2d at 968–70. In this respect, I do not read *Stone* as undercutting the discretion given to corporations to address law compliance in a manner that takes into account the precise circumstances facing the corporation. Rather, I read it as reaffirming the protection given by *Caremark* to directors who make good faith judgments about how their corporations should address law compliance, approaches that will obviously vary because of the different circumstances corporations confront.

96. *Stone*, 911 A.2d at 369–70.

ing to prevent backdating by corporate officers.[97]

Even more than backdating, spring loading presents doctrinally-complex issues. Consider this example. A corporation has been engaged in serious efforts to land a so-called merger of equals. The CFO and COO have missed their summer vacations, their children's baseball games, and every important family occasion for four months, while working on the transaction. The CEO recommends to the independent compensation committee, whose members are protected by a § 102(b)(7) provision, that they make special awards of options as bonuses to the CFO and COO for their extraordinary efforts. The committee agrees that is warranted and makes the awards in advance of the announcement of the merger agreement, recognizing that the announcement will likely increase the company's stock price, as the company is the selling firm under the merger agreement. The corporation's stock option plan does not require that all options be issued at fair market value on the date of grant. In the merger proxy, it is clearly disclosed that the CFO and COO received the grants in recognition of their efforts in connection with securing the merger, that the options will vest and be exercisable if the merger is consummated, and that the corporation has accounted for the options as fair-market-value awards, in good faith reliance upon the advice of tax and accounting advisors that such treatment was literally consistent with applicable regulatory law, especially given that the merger was subject to several closing conditions. In this context, there would be no deception on the corporation's stockholders, as the directors would have fully disclosed why they made the award, and the compensation committee would seemingly be entitled to strong protection from both the § 102(b)(7) clause and § 141(e) of the Delaware General Corporation Law. All of these factors—the candor of the directors about the reason for the grant, their compliance with the terms of the relevant plan, and their good faith reliance on experts— would be of great relevance to a court considering whether a challenge to the grants stated a claim under *Tyson*, because they present a more traditional context in which the fundamental issue is whether the directors have made a rational compensation decision.

Indeed, one can make these facts even closer to *Tyson*, and still see complicating distinctions. Assume that all the facts are the same, except that the stock option plan

---

**97.** If there was any real content involved in the debate about whether dictum in *Cede & Co. v. Technicolor, Inc.*, 634 A.2d 345 (Del. 1993) ("*Cede II*"), had discovered a free-standing duty of "good faith" (thereby elevating the definition of a loyal state of mind into a somehow-separate duty), it was in this area. Many advocates of the "triad[]," believed that independent directors should be held responsible in damages when a fact-finder after the fact determines that the directors, if acting with reasonable diligence, could have prevented harm. Those advocates hoped that a free-standing duty of good faith could be a vehicle toward that purpose, as a way of maneuvering around the protections of § 102(b)(7) and reinstating a more *Smith v. Van Gorkom*, 488 A.2d 858 (Del.1985)-like regime in the area of director monitoring, by terming a supposedly objectively-unreasonable lapse in monitoring to be an action "not in good faith." *E.g.*, Melvin A. Eisenberg, *The Duty of Good Faith in Corporate Law*, 31 Del. J. Corp. L. 1, 23 (2006) ("Good faith in law ... is not to be measured always by a man's own standard of right, but by that which the law has adopted and prescribed as a standard for the observance of all men in their dealings with each other. Indeed, in law generally, the objective elements of good faith dominate the subjective element.") (internal quotation omitted). By making clear that *Caremark* was good law and that damages liability for failures in monitoring required proof of scienter, *Stone* upheld the strong protection afforded to disinterested directors by § 102(b)(7) provisions.

approved by the stockholders expressly required grants to be made at fair market value. But further assume that the stockholders were told that the reason for that condition was singular and predicated solely on the desirability of having all grants qualify for favorable tax and accounting treatment. In fact, the disclosures to the stockholders in advance of the approval vote made clear that the stock option plan was, subject to such qualification, intended to permit the corporation to reward outstanding performance *and* to create incentives for superior future efforts. Under the carefully-crafted test articulated by the Chancellor in *Tyson*, these facts would arguably not give rise to anything other than an excess compensation claim, as it would be difficult to find that the defendants acted in a deceptive manner intended to circumvent the purposes of a stockholder-approved stock option plan.[98]

**98.** As compared to backdated options—which inherently involve plain lies about the option grant date—so-called spring-loaded options do not clearly violate the literal terms of a fair-market-value restriction because such options are issued at the fair market value prevailing in public markets on the date of issuance. The factor driving the *Tyson* holding seemed to be that the fair-market-value restriction within that plan had been sold to stockholders as providing only incentives for future performance, not as a way to reward past performance, and that the spring-loaded issuances essentially breached an implied term of the plan. If, by contrast, a plan was sold to stockholders on the basis that use of a fair-market-value standard was advisable solely to ensure favorable tax and accounting treatment, the analysis would arguably be different. In that situation, the issue would be whether the company's possession of potentially market-moving non-public information would disqualify those options for the favorable tax and accounting treatment typically available for options granted at fair market value, and whether the board knew that to be so. Advice from professional advisors that they believed spring-loaded grants to be eligible for such treatment would be relevant in assessing the liability of directors. *See* 8 *Del. C.* § 141(e) ("A member of the board of directors ... shall ... be fully protected in relying in good faith upon ... any ... person as to matters the member reasonably believes are within [the] person's professional or expert competence.").

Of course, there would remain the issue of deception. But if directors consciously granted options in advance of the issuance of positive information as a bonus, disclosed their motivations candidly, and accounted for the options in good faith reliance on experts, it is difficult to perceive the existence of a fiduciary duty claim other than for excess compensation. Because the directors would have disclosed their motivations openly, the state law obligations of fair disclosure would have been met. And because the parties to the option grant—the corporation and the recipients—were both aware of the information, it would be difficult to frame the transaction as insider trading under any prevailing theory. Under traditional insider trading theories, liability is premised on an information mismatch between a buyer and a seller. *See Chiarella v. United States*, 445 U.S. 222, 227, 100 S.Ct. 1108, 63 L.Ed.2d 348 (1980). That rationale does not pertain. Nor would spring loading fit within a misappropriation theory of insider trading because the non-public information belongs to the company itself, thereby precluding the company (i.e. the "source" of the information) from being the victim of any deceptive act. *See United States v. O'Hagan*, 521 U.S. 642, 652, 117 S.Ct. 2199, 138 L.Ed.2d 724 (1997); *Brophy v. Cities Service Co.*, 70 A.2d 5, 7–8 (Del.Ch.1949); Stephen M. Bainbridge, Corporation Law and Economics, 598–607 (2002).

By contrast, one could imagine how a lack of candor by the directors about the motivation for their actions could generate litigable issues. If directors were to engage in a pattern of awarding officers and themselves options in advance of announcements of positive news, setting the terms of those awards to allow the recipients immediate rewards, and thereafter failing to be honest that that was what they were doing, the lack of disclosure might be relevant in determining whether the awards were motivated by the best interests of the corporation or an intent to stock the larders of those who toil on the top floor of the corporation's headquarters. Again, however, assuming proper tax and accounting treatment, the ultimate issue would turn on whether a proper compensation decision was made, rather than simply on the fact that the options

These examples, which present only a few of the many plausible scenarios in which interesting questions about stock option grants could arise, highlight the need for judicial caution. Lumping context-specific behavior involving varying motivations into generic categories such as backdating, spring loading, and bullet dodging, and driving results by such labeling, seems unlikely to do justice. I endeavor to keep that in mind as I address the implications of the three different categories of Grants that Desimone challenges. I begin with his attack on the Employee Grants.

## C. Desimone's Allegations About The Employee Grants Fail To Plead Demand Excusal

■ The Employee Grants involve options grants of the type described in the Internal Memo, in which stock options issued to rank-and-file employees were deliberately backdated to reflect a strike price equal to the lowest trading price of the quarter, while at the same time represented to be, and accounted for as, fair-market-value grants. Reliance on the Internal Memo has allowed Desimone to make some detailed allegations about the way in which a conspiracy to backdate the Employee Grants was carried out. The financial restatement issued by Sycamore in 2005 admits that a number of Employee Grants made from 1999 to 2001 were improperly accounted for because the options were recorded as having been issued at fair market value, when they were in fact "in the money" as of the actual grant date and deceptively backdated to conceal that reality.

Plaintiff Desimone does not contend that any of Sycamore's directors are interested in the Employee Grants, or that they are incapable of acting independently of the recipients of the Grants. Therefore, the demand excusal analysis regarding these allegations focuses on whether any of the directors faces a substantial threat of personal liability. In that regard, although the fact that wrongdoing occurred is most obvious with respect to the Employee Grants, demand is also most clearly not excused with respect to this category. The Employee Grants were awarded pursuant to the Incentive Plan, which expressly contemplated both that Sycamore's board might delegate most of the option-granting functions to non-director executive officers and that the board itself might play a very minimal role in the option granting process. The complaint pleads no facts to suggest that any member of the board was involved in the details of the Employee Grants in any way, much less that the board was driving the process by, and dates on, which options were awarded.

Nor can any reasonable inference to that effect be drawn. The complaint alleges that the Incentive plan was "administered by the Compensation Committee," which consisted of two of the Outside Directors, defendants Barrows and Ferri.[99] I accept this allegation as true, as I must. Nonetheless, that vague and conclusory statement does not suggest in any way that the Compensation Committee was involved in or had knowledge of any backdating. With respect to rank-and-file Employee Grants, the Compensation Committee is most likely to have administered the Incentive Plan by delegating options-granting responsibility to executive officers. Indeed, it defies logic to infer that these two Outside Directors were constantly present at Sycamore to sign off on each of these small options Grants, and the complaint does not allege that they did. Nor does the complaint allege that any of the other directors had any responsibility over these Grants. Rather, the complaint alleges that

were consciously granted in advance of the release of positive information.

**99.** Complaint at ¶ 57.

Employee Grants and the process by which they were backdated were overseen by defendant Frances Jewels, Sycamore's non-director CFO. In his complaint, Landry contended that Jewels, the "enforcer" of Sycamore's backdating scheme, asked him to perform a number of tasks designed to cover up the fact that the options were being backdated.[100] The Internal Memo outlines a number of these covert acts.[101] Those detailed allegations clearly state a claim against Jewels for improperly backdating the Employee Grants and then covering the misconduct up. The problem for plaintiff Desimone is that he is trying to state Sycamore's claim against Jewels, and the complaint fails to plead any facts to suggest that Sycamore's board shares her culpability. In fact, Desimone admits that he has not and cannot allege in good faith that even the Compensation Committee knowingly approved backdated Option Grants for these employees.[102]

As a final point in this regard, I acknowledge that the complaint suggests in passing that Sycamore's CEO and director Daniel Smith might have played a role in the backdating of the Employee Grants. The allegation is that Smith was identified by *Landry* as "one of the executives who along with Defendant Jewels approved the illegal stock options."[103] In other words, Desimone bases his allegation that Smith was involved in backdating the Employee Grants solely on the fact that Smith was identified in Landry's public denouncement of Sycamore. But neither Desimone nor Landry identify any particularized factual allegations in support of their conjecture that Smith was involved. There is no indication that Landry ever had any interaction with Smith in this regard, and it is likely that Smith was included in Landry's denouncement simply because he was seen by Landry as the top executive in charge of the company. Indeed, Landry himself merely makes the conclusory and speculative assertion that the backdated options were approved by "Jewels *and/or* []Smith."[104] Desimone parrots that accusation,[105] and as a result, Desimone has not even lodged a good faith allegation that Smith knew of Sycamore's backdating operation. The spineless "and/or" is a telling concession that he cannot cross even the minimal Rule 11 threshold.

Plaintiff Desimone next contends that even if the directors were ignorant of the backdating activity, that ignorance resulted from an abdication of the board's duty to monitor the corporation's compliance with applicable laws and regulations. He contends that Sycamore's internal controls were "woefully deficient," as evidenced by the ease with which the backdating operation was carried on and that, as a result, all of the Director Defendants, and particularly the three Audit Committee members, face a substantial likelihood of personal liability for "failing to adequately monitor Sycamore's financial reporting and to detect, prevent, and/or halt the modification of stock option grant dates and the material misstatements complained of herein."[106]

In *Caremark*, Chancellor Allen explained that this type of lack of oversight claim "is possibly the most difficult theory in corporation law upon which a plaintiff might hope to win a judgment."[107] That

---

100. Complaint at Ex. A.

101. Complaint at Ex. B.

102. Transcript of Oral Argument (March 9, 2007) at 82.

103. Complaint at ¶ 18.

104. Complaint at Ex. A (emphasis added).

105. Complaint at ¶ 18.

106. Complaint at ¶ 68(h).

107. 698 A.2d at 967.

statement has been quoted in a number of this court's decisions, and the Delaware Supreme Court recently reiterated this point in *Stone v. Ritter* by clarifying that this type of liability is founded upon a breach of the duty of loyalty. As *Guttman* stated and *Stone* reinforced, "imposition of liability [on this theory] requires a showing that the directors knew that they were not discharging their fiduciary duties." [108] "Only a sustained or systematic failure of oversight ... will establish the lack of good faith that is a necessary condition to liability." [109] Thus, in order to state a viable *Caremark* claim, and to predicate a substantial likelihood of director liability on it, a plaintiff must plead the existence of facts suggesting that the board knew that internal controls were inadequate, that the inadequacies could leave room for illegal or materially harmful behavior, and that the board chose to do nothing about the control deficiencies that it knew existed.[110]

Here, Desimone has not alleged any facts to suggest that Sycamore's internal controls were deficient, much less that the board, the Audit Committee, or Sycamore's auditors had any reason to suspect that they were or that backdating was occurring. Delaware courts routinely reject the conclusory allegation that because illegal behavior occurred, internal controls must have been deficient, and the board must have known so.[111] The closest the complaint comes to alleging the existence of a red flag to suggest culpable directorial abdication is to assert, without any supporting facts, that "the [Internal Memo] indicates that it was *apparently* fairly widely known within the Company that the

internal controls were inadequate." [112] The inference the plaintiffs would have me draw is that if it was "widely known" within the company that stock options were backdated, the directors *must also have known* about that and thus abdicated their oversight responsibilities by failing to take remedial action.

A fair reading of the Internal Memo, though, provides no basis for an inference that knowledge of options backdating was widespread within Sycamore. Indeed, the complaint alleges that the Memo was disseminated only to a single employee in the human resources department—the very employee charged by Jewels with taking the covert actions designed to cover the backdating up. The substantive content of the Internal Memo itself merely indicates that its author and its recipient set about to manipulate the exercise price of six sets of stock options on a single occasion and that those two individuals had substantial knowledge of the details of Sycamore's audit procedures and as a result knew how to hide the backdating activity from Sycamore's auditors and, most likely, Sycamore's board and its three-member Audit Committee. In fact, the Memo details the efforts that were made to keep the backdating under wraps. In fact, Landry himself, who revealed the Memo, explicitly stated that backdating was contrary to company policy and that the modification of employee start dates was expressly forbidden.[113] As a result, Desimone has failed to plead a *Caremark* claim against Sycamore's directors with particularity, and demand is not excused with respect the Employee Grant allegations.

---

**108.** *Stone,* 911 A.2d at 370 (citing *Guttman,* 823 A.2d at 506).

**109.** *Caremark,* 698 A.2d at 971.

**110.** *Stone,* 911 A.2d at 373.

**111.** *Id.* (recognizing that a good faith exercise of oversight responsibility may not invariably prevent employees from causing harm).

**112.** Complaint at ¶ 68(h) (emphasis added).

**113.** Complaint, Ex. A at ¶ 13.

### E. Desimone Fails To Plead Demand Excusal With Respect To The Officer Grants

■ As with the Employee Grants, Desimone does not contend that any member of Sycamore's board is interested in the Officer Grants or dependent upon any Officer Grant recipient. Desimone's allegations with regard to these Officer Grants involve accusations of backdating as well as both spring loading and bullet dodging. Because the issues raised by the different allegations are distinct, I address them separately.

#### 1. Allegations of Backdating

The allegedly backdated Officer Grants that Desimone challenges consist of two isolated sets of options grants that occurred in April 2001 and April 2002. Desimone points out that the dates of these Officer Grants followed steep market declines and immediately preceded a sharp upswing. He contends that such fortuitous timing shows that those options must also have been granted later and backdated to the time when the price was at its low point. For purposes of the present analysis, I will assume that all of the Officer Grants were in fact backdated.[114]

On April 9, 2001, four days after Sycamore disclosed that it would miss its third quarter earnings forecast, Sycamore issued 500,000 options to Francis Jewels and a combined 550,000 options to four other executive officers. The stock price on April 9, 2000 was $7.39, down from $12.00 ten days earlier. Within the next twenty days, the stock rose 52.5% to $11.27.[115]

On April 29, 2002, Sycamore awarded Francis Jewels 500,000 options and another of the Officer Defendants, Kevin Oye, 1,000,000 options at an exercise price of $3.34. Ten days earlier, Sycamore's stock traded at $3.76. Within twenty days of the Grants, the stock price increased 10.5% to $3.69. On December 29, 2006, while this motion was pending, Sycamore essentially admitted that the 2002 Officer Grants were not actually made on April 29, 2002 when it disclosed that Kevin Oye had agreed to re-price 166,667 of the 1,000,000 options granted to him to $3.40 per share, stating that $3.40 "represents the fair market value of the Options on the date currently believed to be the best available estimate of the grant date." [116]

Of course, large options grants to executive officers present a scenario in which it is far less likely that responsibility for the grants was delegated by the board. Indeed, I assume that it would have been improper for the board to have delegated authority to Frances Jewels, a recipient of

114. I doubt, however, that this would be a proper inference to actually draw in this case. In *Ryan*, the Chancellor drew an inference that options had been backdated from a strong statistical showing involving a pattern of options grants over a five year period. The complaint in *Ryan* accounted for all options granted to management during the period and found that the options recipients earned a 243% annualized return on the options grants, while annualized market returns for the same period were only 29%. *See Ryan*, 918 A.2d at 354. By contrast, here, only two sets of Officer Grants were identified and there is no indication from the face of the complaint whether these were the only Officer Grants made during the period discussed in the complaint. Moreover, Desimone has made no attempt to determine the annualized return that the Officer Grant recipients have earned, and it must be noted that one of the challenged sets of Officer Grants, the April 2001 Grants, are currently well underwater.

115. Notably, April 9 was not the stock's low point during that thirty day period. On April 6, the previous trading day, Sycamore's stock closed at $7.25. The plaintiff does not try to explain why, if the April 2001 Officer Grants were deliberately backdated, they were not backdated to the most advantageous date.

116. Sycamore Networks, Inc., Current Report (Form 8–K) (December 29, 2006).

two large options awards, to issue options to herself. As a result, although not directly alleged, it is reasonable, at this stage, to infer that Sycamore's Compensation Committee retained direct authority over the Officer Grants.

That does not mean, however, that I can infer that the Compensation Committee knowingly approved backdated options and Desimone has admitted that he cannot in good faith allege that any director did.[117] In other words, the plaintiff admits that he has no idea how, when, or by whom the Officer Grants were issued. As stated, I can infer that the Compensation Committee approved the amount and recipients of the Officer Grants. But I can infer nothing from the pled facts about whether and to what extent any director was involved in the mechanics by which the options were issued or the dates on which that administrative task was carried out. In this regard, Sycamore's recent announcement about Oye's agreement to re-price some of his options actually supports, to some extent, the defendants' dismissal motion. The six cent per share re-pricing indicates that the Grant to Oye was actually made on May 2, 2002, three days after April 29, a problem that seems more plausibly to have possibly resulted from the failure by advisors to get paperwork completed and signed in a timely way. By contrast, one cannot draw a *rational* inference that this modest gap derived from an intent on the part of Sycamore's directors to allow Oye a six cent per option advantage. Several pages ago, I discussed two very different options backdating scenarios, one of which involved knowing directorial action and one of which did not. The primary reason why the complaint fails to plead demand excusal is that Desimone has not pled facts suggesting an inference that the Sycamore board knowingly granted Sycamore's offi-cers backdated options. Dismissal is warranted on that basis alone.

As important, Sycamore's Compensation Committee consisted of only two out of six board members, not half of the board as in *Ryan*. Thus, even assuming that the complaint established a substantial likelihood of personal liability on the part of the two Compensation Committee members, dismissal would be required unless the complaint established, through well-pled, particularized factual allegations, that at least one other board member is substantially likely to be personally liable, which it does not. As discussed above, there are no factual allegations to support a claim that Sycamore's CEO, Daniel Smith, was complicit in any backdating activity, nor does the complaint allege that Sycamore's other Inside Director, Chairman Deshpande, was involved in any way.

With regard to the other two Outside Directors, Defendants Gerdelman and Chisholm, I reject Desimone's contention that they knew that stock options were being backdated simply because they served on Sycamore's Audit Committee. There are no facts pled in the complaint that provide a basis for inferring knowledge on the Audit Committee's part of options backdating. Although Audit Committee members play a more active role in ensuring the accuracy of a company's financial statements, the fact that Sycamore accounted for the backdated options grants incorrectly does nothing to suggest any conscious wrongdoing on the part of the Audit Committee and is consistent with the notion that the Audit Committee was simply ignorant of any backdating. Nor does Desimone plead facts stating a claim against Gerdelman or Chisholm under the stringent *Caremark* standard.

117. Transcript of Oral Argument (March 9, 2007) at 82.

I also reject Desimone's contention that knowledge on the part of any one board member can be imputed to other board members as a result of their shared board or committee service. For that proposition, Desimone cites *Saito v. McCall*.[118] In that case, the complaint pled specific facts that the company's Audit Committee knew of certain accounting risks and that the risks were specifically discussed with some board members. Based on those allegations, Chancellor Chandler held that he was permitted to draw an inference that the information was also communicated to certain other directors, thereby, according to Desimone, "imputing" knowledge to them.[119]

■ But *Saito* did not lay down any universally applicable rule about knowledge imputation. Rather, that decision merely involved the drawing of reasonable inferences from well-pled facts. By contrast, here, the complaint does not allege that backdating was ever discussed by any of Sycamore's board members at any time during the period in which the options were backdated. As a result, the complaint does not plead any facts to permit an inference that backdating was the subject of regular communication in the boardroom at Sycamore the way the complaint in *Saito* established that the accounting problems involved in that case were openly discussed by the directors. Delaware law does not permit the wholesale imputation of one director's knowledge to every other for demand excusal purposes.[120] Rather, a derivative complaint must plead facts *specific to each director*, demonstrating that at least half of them could not have exercised disinter-

ested business judgment in responding to a demand.[121] Desimone has not done that, and, therefore, demand is not excused.

### 2. *Allegations of Spring Loading And Bullet Dodging*

■ In the previous section, analyzing Desimone's backdating allegations with respect to the Officer Grants, I assumed that all of the Officer Grants were in fact backdated. As I noted, I am not convinced that such an inference can be properly drawn from the complaint. As an alternative contention to his backdating claim, Desimone raises an argument that even if the Officer Grants were not actually backdated, one of the Officer Grants was improper because Sycamore manipulated the release of material non-public information in order for the options recipients to get the benefit of an artificially-low exercise price. The allegation is that on April 5, 2001, Sycamore announced that revenue and earnings for the third quarter would be lower than previously projected primarily due to low customer orders. Within a day of that announcement, Sycamore's stock price dropped from $9.06 to $7.25. The 2001 Officer Grants were dated April 9, when the stock price was at $7.39. Sixteen days later, on April 25, Sycamore made a positive announcement regarding its market share in the "European Metro DWDM market." Over the next week, Sycamore's share price trended generally upward, closing at a high of $12.02 on May 2.

These allegations combine elements of both bullet dodging (i.e., issuing options on the heels of a release of negative information) and spring loading (issuing options

118. 2004 WL 3029876 (Del.Ch.2004).

119. *Id.* at *7 n. 68.

120. *See Rattner v. Bidzos,* 2003 WL 22284323, at *11 (Del.Ch.2003) (holding that directors cannot be charged with knowledge of infor-

mation merely because they served on a board with a director who may have known such information).

121. *E.g., Beam v. Stewart,* 845 A.2d 1040, 1050–51 (Del.2004).

just before a release of positive information). Through them, Desimone hopes to make out a claim of disloyalty under the theory articulated in *Tyson*, which is that directors breach their fiduciary duties if they approve spring-loaded or bullet-dodging options in a bad faith effort to circumvent stockholder-approved restrictions on the exercise price of options.[122] There are several important differences, however, between this case and *Tyson*, the most important of which for purposes of this claim is that the Incentive Plan, under which the Officer Grants were made, did not impose any such option exercise price restrictions. Rather, below-market options were expressly permitted by the Incentive Plan. Therefore, there were no rigid exercise price restrictions to circumvent.

With regard to the bullet dodging allegations, I am skeptical that a bare allegation that a board of directors made a discretionary issuance of stock options at the market stock price after releasing negative information can ever be sufficient in itself to state a claim of director disloyalty, even when a stockholder-approved option plan requires fair-market-value grants. In this regard, there is a material difference between spring loading and bullet dodging. With spring loading, a director is granting options at a time when he knows the company's stock is worth more than its market trading price because the market is ignorant of information that will affect the price. That is not so with bullet dodging. When a director grants options after a release of negative information, he does so at a time when the market has absorbed all existing information about the company. Even under *Tyson*, there is no obvious reason why a company that wishes to

grant its officers and employees stock options as an incentive to align the employee's interests with those of the company, cannot wait until after the company releases negative news to the market to grant the options, so long as it is not in possession of non-public information that will likely cause the stock price to rebound immediately. In that situation, there are traditional corporation law principles that would apply to determine whether the grant was inequitable. If the grantor board or committee was independent of the recipients, the question would be whether the size or fact of the option grant was so egregious under the circumstances as to constitute a waste of corporate assets. Alternatively, if the grantor board or committee was dominated or controlled by the options recipients, the analysis would turn on whether the transaction involved unfair self dealing and the option recipients would bear the burden of establishing that the options grants were fair to the corporation. In either of those analyses, the fact that negative information was released to the market just before the option grant might or might not be relevant to the court's analysis, but it would not categorically condemn the challenged grant.

Understanding why is not difficult. The recipient of a bullet-dodging option takes the option with an exercise price equal to the current value of the stock and will realize no value from it, except to the extent the stock price increases from present levels. It would be an odd compensation practice indeed to make a discretionary[123] grant of market-price options when the board knows that the stock is actually worth less than the market price. After

---

**122.** *Tyson*, 919 A.2d at 575–76.

**123.** Moving the date of an option grant under a plan contemplating annual awards on a date certain, or manipulating the timing of

disclosures in connection with such options grants might have different implications, given the "for better or worse" signals such plans send. I discuss this issue later in connection with the Outside Director Grants.

the bad news is disclosed, the option recipient would be left with underwater options. Corporate morale would likely suffer, rather than improve, by grants of that kind. By waiting until after the negative news is disclosed, the company ensures that the options are granted at a strike price equal to what the stock is actually worth. In any event, those are the kind of situational business judgments, which traditional corporation law principles leave to disinterested directors.

I turn now to the allegation that the 2001 Officer Grants involved tainted spring loading because Sycamore released positive information sixteen days after those Grants. The exotic options practices of American corporations will undoubtedly generate multiple occasions for this court to ponder the complexities of spring-loaded options. To resolve the present case, I need not delve further into them because Desimone's complaint fails to plead particularized facts suggesting that Sycamore's directors knowingly spring loaded any options grants. As a result, even under the generous assumption that such an allegation without more would state a claim, demand is not excused.

Desimone's complaint simply does not allege that any director was aware of the positive information at the time the 2001 Officer Grants were made. Nor would it be reasonable to draw such an inference from the facts that are pled, given that the positive information was not released until more than two weeks after the Grants. This is crucial because in light of Sycamore's exculpatory charter provision, a scienter-based standard for liability applies in determining whether any director faces a threat of personal liability for these Grants.

The implausibility of drawing an inference that the directors intended the Officer Grants to include an element of a hidden bonus also flows from the nature of the positive information that underlies Desimone's spring loading allegations. Compared with the type of clearly market-moving announcements at issue in Tyson,[124] the positive information that Sycamore announced on April 25, 2001 was not of the type that was certain to send Sycamore's stock price soaring. The allegation that Desimone makes is that "Sycamore announced that it had secured that number one position with thirty two percent share [sic] in the European Metro DWDM market."[125] But the complaint fails to enlighten the reader as to what the "European Metro DWDM market" is or how important it was to Sycamore's business during that period. In fact, Sycamore's stock price traded *downward* during the first two days after the announcement![126] Moreover, it is far from clear that the strong upward surge thereafter was causally related to the announcement. Sycamore's share price was fairly volatile during this time period and from the charts included in the complaint, it does not appear that price swings in excess of 10% within a relatively short period were uncommon. When that fact is coupled with the vesting restrictions imposed upon the Officer Grants, the "positive" announcement made after the Officer Grants becomes even less material. Even if the announcement did strangely cause a *belated*[127] short-term spike in the stock price,

124. For example, one of the announcements involved in the *Tyson* case was the announcement of Tyson's decision to cancel its $3.2 billion deal to acquire IBP, Inc., which sent Tyson's shares up 17% by the close of the trading day. *Tyson*, 919 A.2d at 576.

125. Complaint at ¶ 43.

126. *Id.*

127. Could the market have been researching what the "European Metro DWDM Market" was during the several days after the announcement? "Oh, now we get it, let's buy!"

given the price swings to which Sycamore's stock was susceptible, the announcement would not have been likely to have had a substantial effect on the stock's trading price months later when the first of the options vested, much less on the bulk of the options, the last of which did not vest for three years.

In this same respect, it is notable that Desimone fails to provide any information about how Sycamore's stock performed on a market-adjusted basis during this period. The complaint leaves me with no idea of whether Sycamore's swings were correlated with overall market movements, and generates no pleading stage inference either that the directors made the 2001 Officer Grants knowing that a forthcoming announcement would move the share price in a positive direction or that the announcement that was made in fact had a materially positive effect on Sycamore's stock price.

Finally, because Sycamore's two Inside Directors, board Chairman Deshpande and President and CEO Smith, owned, between them, nearly a third of the company and did not receive any allegedly improper options grants, it is difficult to infer any motive on their part to enrich Sycamore's executive officers at the expense of its stockholders. Any undue enrichment of such officers would have come largely at Deshpande and Smith's own expense. Deshpande and Smith receive very little in the way of compensation for their services on behalf of the company and therefore the only way for them to benefit from their efforts as officers and directors is to increase shareholder value. As a result, Deshpande and Smith would seem to have been highly motivated only to grant options to executive officers on terms that provided the recipients with a strong incentive to perform well.

In sum, by contrast to the allegations in *Tyson,* where the complaint pled a multi-year pattern of extraordinary options grants to key insiders—including members of the board—just before the release of clearly material, market-moving positive information, the complaint here contains weak allegations about a single alleged instance of spring loading involving information that did not even clearly affect the corporation's stock trading price, without identifying who was responsible for the spring loading or identifying any plausible motive on the part of an entirely disinterested board to improperly enrich the Officer Grant recipients. As a result, Desimone has failed to plead facts showing that Sycamore's directors face a substantial threat of liability with respect to his allegation that the 2001 Officer Grants were tainted by spring loading.

### F. The Allegations About The Outside Director Grants Fail To State A Claim

I now turn to the allegations about the Outside Director Grants, which focus on two sets of options grants made pursuant to the Outside Director Plan to the four Outside Directors. As stated, the Outside Director Plan provided for an automatic grant of 30,000 market-price options to each Outside Director each year, effective as of the date of Sycamore's annual meeting. The challenged Outside Director Grants occurred on December 13, 2001 and December 18, 2003, respectively.

The allegation regarding the Outside Director Grants is essentially that they, like the Officer and Employee Grants discussed earlier, were very favorably timed, too much so to be a matter of luck, and therefore some misconduct must have occurred. The 2001 Grants were made with an exercise price of $4.60 per share. Ten days earlier, Sycamore's shares were trading at $5.14 apiece. Twenty days after the Grants, they were back up to $5.17. The 2003 Grants were made at an exercise price of $4.59 per share. Ten days earlier,

Sycamore's shares traded at $4.94 apiece. Twenty days after the Grants, they were above $6. The complaint further points out that the 2001 and 2003 Outside Director Grants came shortly after (by about a month) the release of Sycamore's first quarter performance results in each of those two years, which occurred in the second week of November. Desimone contends that those disclosures contained negative information that caused Sycamore's stock price to trade downward in the following weeks so that when the options were granted pursuant to the Outside Director Plan in mid-December, the Outside Directors got the benefit of a lower exercise price than they otherwise would have had. In 2001, the first quarter results showed a decrease in revenue and a net loss of $247.9 million, which included a non-cash charge of $202.5 million. In 2003, the first quarter results reported a $12.2 million net loss.

■ Analysis of the Outside Director Grant allegations requires a different approach than that engaged in with respect to the Employee and Officer Grants. A majority of Sycamore's directors are recipients of the challenged Outside Director Grants. Demand is excused under the *Rales* test if a majority of the board is interested in the transaction being challenged.[128] Because the Outside Directors received the Outside Director Grants and stand on the other side of the transaction from the company, they are interested in the sense that they have a personal financial stake in the challenged Grants that is at odds with the interests of Sycamore.[129]

■ Moreover, when some of the directors are interested, the court must inquire whether any of the other directors are compromised in their ability to act independently of the directors found to be interested.[130] In this regard, it is difficult to conclude that the two Inside Directors, Smith and Deshpande, can be deemed, for demand excusal purposes, independent of the Outside Directors. Although Smith and Deshpande are, to say the least, hardly among the most highly-compensated corporate executives in America, they nonetheless have a strong interest in remaining in their corporate offices. Those offices allow them, at the least, to exercise a large amount of personal control over their substantial—but not majority—equity investment in the company. Smith and Deshpande serve in their corporate offices by the grace of Sycamore's board, the majority of which is comprised of the very Outside Directors who would be defendants in any suit challenging the Outside Director Grants.

Therefore, because of the Outside Directors' interest in the challenged transactions, and the likely inability of the Inside Directors to act independently of them, the *Rales* test indicates that demand is excused with regard to the Outside Director Grants.[131] I will assume for purposes of

128. *Guttman*, 823 A.2d at 501–02.

129. *See id.*

130. *Id.*

131. *See id.* When independent directors receive stock options in conformity with a stockholder-approved option plan that calls for a specific number of options to be granted on a specific date each year, and a complaint pleads no facts suggesting a deviation from that plan, one can conceive of a rational argument for contending that a derivative plaintiff must meet a Rule 23.1 pleading standard to attack the independent directors' receipt of those options, irrespective of whether a majority of the board were recipients, because the threat of personal liability is so insubstantial. That said, the briefing in this case does not dilate on this subtlety and I decline to premise my decision on that potential ground. Indeed, that route is complicated by this simple logic. In situations when a majority of the board is not interested in the transaction

this analysis that demand is in fact excused on this basis. The inquiry in determining whether to allow the plaintiff to proceed past the pleading stage is therefore whether the complaint's allegations state a claim under the more lenient Rule 12(b)(6) standard.

■ The plaintiff initially contends that the beneficial timing of the 2001 and 2003 Outside Director Grants gives rise to an inference that those Grants were deliberately backdated and that the allegations state a claim under this court's holding in *Ryan.* That contention, however, is unsupported by pled facts. The Outside Director Grants occurred automatically each year on the date of Sycamore's annual stockholders meeting, which was scheduled far in advance. The complaint makes no allegation that the Grants were not in fact made on those pre-scheduled dates, nor does it allege that the dates of the meetings themselves were in any way manipulated to achieve a more beneficial option exercise price. In other words, the backdating allegation is contradicted by complaint itself and the documents it incorporates.[132] Moreover, the fact that the Outside Director Grants were in fact made on the date they were represented to have been made is corroborated by the fact that the Outside Directors filed their respective Form 4s with the SEC within days of the Grants.[133]

Desimone's marginally more colorable claim with respect to the Outside Director Grants is a bullet dodging allegation similar to the one he makes with respect to the 2001 Director Grants. The contention is that the challenged Grants came on the heels of a negative quarterly earnings report, which caused the stock price to go down and gave the Outside Directors the benefit of a lower exercise price for their options. As discussed, I am skeptical that bare allegations of this type in connection with an option plan that allows for discretionary options grants have any claim-sustaining relevance in light of the fact that the exercise price of the options is equal to a market price on the date of the grant that incorporates all existing material information. Even when an option plan requires fair-market-value grants, such grants fully comply with that restriction.

Option plans, like the Outside Director Plan, that provide for non-discretionary, regularly-scheduled options grants present their own distinct issues. The Outside Director Plan was the primary mechanism through which Sycamore compensated its Outside Directors. As such, the Outside Director Plan is essentially an agreement between Sycamore's board and its shareholders as to precisely how much compen-

---

under attack, the use of a particularized Rule 23.1 standard to measure their potential exposure to liability makes sense. Because a majority of the board is not subject to any adversity from a rescission or disgorgement order, requiring something more than the mere statement of a claim satisfying Rule 12(b)(6) is efficient. By tying demand excusal to the pleading of a claim that survives a particularity standard, *Rales* efficiently balances the interests at stake by enabling cases to proceed when otherwise disinterested directors nonetheless face a substantial threat of liability because the claims against them have survived a defendant-friendly pleading standard. By contrast, when a majority of the directors are interested in the transactions under challenge and do face adverse consequences from a disgorgement or rescission order, the use of a 12(b)(6) standard arguably strikes the optimal balance.

**132.** *See Malpiede v. Townson,* 780 A.2d 1075, 1083 (Del.2001) ("A claim may be dismissed if allegations in the complaint or in the exhibits incorporated into the complaint effectively negate the claim as a matter of law.").

**133.** *See, e.g.,* Timothy A. Barrows, Statement of Changes in Beneficial Ownership of Securities (Sycamore Networks, Inc., Form 4) (December 19, 2003).

sation the Outside Directors will receive, and it ties that compensation directly to the company's financial performance. The superior informational position in which the directors stand provides them with the chance to contravene the reasonable expectations of the shareholders as to director compensation under the agreement. Because the directors have the ability to control the flow of information about the company's performance into the market, they might, at times, be presented with an opportunity to manipulate the share price on the date of the option grant for their own benefit. This type of misuse of corporate information to circumvent implicit assumptions underlying an option plan's terms resembles the type of misconduct that drew concern from Chancellor Chandler in the *Tyson* decision.

Admitting the possibility that director action of that kind could conceivably constitute a breach of fiduciary duty does not aid Desimone, however. Desimone's allegations are very different from that scenario, and his allegation that the company made regular, pre-scheduled periodic disclosures containing negative information before automatic, non-discretionary grants of options does not state any cognizable claim. In fact, to hold that the Sycamore board somehow breached its fiduciary duties by making a pre-scheduled periodic disclosure containing negative information before the automatic options grants would establish an arguably perverse precedent. That kind of ruling would encourage directors to withhold material information from the investing public in order to satisfy their fiduciary duties in connection with regularly-scheduled, non-discretionary options grants, even though a concern for investors and federal disclosure requirements would instruct them to disclose it.

Nor, in a circumstance involving a non-discretionary plan like Sycamore's, is it an answer to say that the directors should simply forego their options or set the strike price higher than the market price reflecting the regularly-announced negative information. To force the directors to do either would deny them the benefit of the bargain they struck with the shareholders in the option plan. Under the plan, the directors are entitled to options with exercise prices equal to the current value of the company's stock and are entitled to capture the full amount of any future price appreciation. The shareholders knew at the time they approved the option plan that the scheduled date of the option grants would come on the heels of the date on which the company typically makes a regular periodic disclosure about operating performance. The shareholders thus implicitly agreed that even if the company performed poorly in a given year or quarter and the share price declined following disclosure of those results, the directors would still be entitled to options with exercise prices at a fair market value that reflects the negative information.

In the same goose and gander vein, though, directors would raise questions about their fidelity by making a discretionary decision to withhold from the public positive information in front of the option grant date. That is, option plans that provide for automatic options grants following the time at which the company typically makes a regular disclosure of performance results contemplate that, with respect to the upcoming option grant, the strike price will, for good or ill, reflect the material information about the company's performance in the prior period. The ultimate value of the compensation from the new grants will depend on the market's view of the firm's value based on material information arising after the grant date, i.e., its view of the corporation's performance after, not before, the grant date. Implementation of this feature of the option

plan implicitly requires the company to adhere to regular disclosure practices.

Therefore, if allegations that a company disclosed material information affecting its stock price in proximity to an automatic, regularly-scheduled option grant are to support a breach of fiduciary duty claim based on the theory accepted in *Tyson*, they must involve allegations that the company deviated from a regular disclosure pattern in a deceptive, non-candid effort to influence the exercise price of options and circumvent the intended functioning of the stockholder-approved option plan. But when, as here, the complaint simply alleges that the directors took the good and the bad that came with a non-discretionary plan, by receiving their options annually on the specified date regardless of the positive or negative nature of the regularly-issued quarterly report preceding the grants, no breach of fiduciary duty claim is stated. In this regard, it is telling that, although the Outside Directors supposedly made out handsomely from the Grants in 2001 and 2003, the complaint is conspicuously devoid of allegations regarding any grants under the Outside Director Plan from other years during the relevant time period. That is, it fails to discuss at all the regularly scheduled 1999, 2000, 2002, and 2004 grants. One suspects that the Outside Directors were not quite so fortunate in those other years. That there was favorable short-term stock price movement in some years and unfavorable movement in others is consistent with the non-discretionary terms of the Outside Director Plan.

For all of those reasons, the plaintiff's allegations regarding the Outside Director Grants fail to state a claim.

## V. *Desimone's Inadequate Investigation Allegations*

■ As a final effort to sustain his complaint, Desimone complains that Syca-more's board conducted an ineffectual investigation of the stock option practices that are the subject of federal regulatory inquiries. Likewise, he claims that the board has been too soft on defendant Jewels and others who were directly responsible for the wrongdoing. Desimone contends that the limited scope of the internal investigation and the board's failure to require the recipients of backdated options to disgorge or re-price them amounts to a breach of fiduciary duty by Sycamore's board. On this basis, he says his complaint should go forward even if his more direct attacks on the option grants should be dismissed.

To indulge this argument in this context would, in my view, undo a good deal of our settled law. Had Desimone chosen to make a demand on the Sycamore board, he would have to challenge the Sycamore board's consideration of his demand under the standard set forth in, among other cases, *Levine v. Smith,* and the pertinent question would be whether the demand was wrongfully refused.[134] Having forsaken that approach, Desimone is not entitled to bypass the consequences of failing to plead demand excusal by making the accusation that the Sycamore board has inadequately investigated his claims. Derivative plaintiffs need to choose their path. A derivative plaintiff cannot fail to make a demand on the basis that demand is excused, fail to meet his burden to plead demand excusal, and then try to preserve his right to proceed by arguing in essence that the board wrongfully refused a demand that he never made.

In any event, Desimone's allegations about Sycamore's internal investigation do not come close to pleading particularized facts suggesting that the Sycamore board's investigatory efforts, or its determinations as to what, if any, relief to seek from current or former officials, have been

---

**134.** 591 A.2d 194, 212 (Del.1991).

so deficient as to expose the board to liability under either the *Levine* or *Rales* standards. In fact, having failed to seek access to Sycamore's books and records before filing suit, Desimone has no idea what the investigation actually entailed and is unable to plead any facts about what the Sycamore board did, when they did it, what they discussed, what conclusions they reached, and why the board did or did not do anything.[135] Moreover, the board's investigative efforts have yet to be concluded,[136] and therefore, Desimone's complaints about the allegedly inadequate investigation are premature.[137] In fact, as previously noted, while this motion was pending, Sycamore announced that the company had reached an agreement with Kevin Oye to re-price some, but not all, of the options granted to him in the 2002 Officer Grants.

For these reasons, Desimone's conclusory allegation that the Sycamore board has failed to adequately investigate the substantive claims that Desimone is not entitled to press for lack of standing, failure to plead demand excusal, and failure to state a claim does not breathe life into his otherwise moribund complaint.

## VII. *Conclusion*

For the reasons stated, the complaint is dismissed because plaintiff Desimone: (1) lacks standing to challenge options grants made before February 4, 2002, the date on which he first bought Sycamore shares; (2) has failed to plead demand excusal as to the allegations challenging the Officer and Employee Grants; and (3) has failed to state a claim upon which relief can be granted as to the allegations challenging the Outside Director Grants. Because these rulings also dispose of the claims against the Officer Defendants, I do not address their distinct arguments for dismissal. IT IS SO ORDERED.

135. Notably, the only "fact" (if it can be called that) that Desimone does allege about the investigation is contradicted by other allegations in the complaint itself. The complaint claims the investigation was inadequate because it focused only on the six instances of backdating specifically listed in the Internal Memo and did not expand the inquiry to determine if the practices identified in the Memo were more widespread. But Desimone also alleges that the financial restatement that arose out the investigation identified *twelve* specific instances of manipulation (six start date changes and six option cancellations and reissues), not just the six that were identified in the Internal Memo. Complaint at ¶ 32. The restatement also identified a problem with the April 14, 2000 options grants that were not mentioned in the Memo. *Id.*

136. Transcript of Oral Argument (Mar. 9, 2007) at 33.

137. *See, e.g., BTZ, Inc. v. National Intergroup, Inc.,* 1993 WL 133211, at *3 (Del.Ch.1993) (stating that "[a] plaintiff [] must wait a reasonable period of time after submitting a demand before filing suit," and holding that a complaint was subject to dismissal because the plaintiff did got give the board a reasonable amount of time to consider the far-reaching legal and business issues raised by the demand).